FILED
United States Court of Appeals
Tenth Circuit

December 26, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WILLIE BARLOW, JR.,

      Plaintiff-Appellant,

v.

C.R. ENGLAND, INC.,

      Defendant-Appellee.

No. 11-1465

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:09-cv-02476-CMA-MJW)**

Jennifer Robinson, Robinson & Associates Law Office, LLC, Denver, Colorado, for
Plaintiff-Appellant.

Andrew D. Ringel, (Gillian Dale with him on the brief), Hall & Evans, L.L.C., Denver,
Colorado, for Defendant-Appellee.

Before **BRISCOE,** Chief Judge, **GORSUCH** and **MATHESON**, Circuit Judges.

**BRISCOE**, Chief Judge.

      Plaintiff Willie Barlow, Jr., appeals from the district court's grant of summary

judgment for his former employer, C.R. England, Inc., on his claims for race

discrimination,[1] wrongful discharge in violation of Colorado public policy, and failure to pay overtime in violation of the Fair Labor Standards Act (FLSA).  England employed Barlow as a security guard and also paid him to perform janitorial work through a company Barlow formed.  Barlow began receiving workers' compensation benefits after he sustained an injury at work in June 2007.  In November 2007, England terminated its janitorial services contract with Barlow's company.  In April 2008, England fired Barlow from his security guard position after he failed to notice and report a theft of several trailer doors from England's premises.

Barlow brought this suit and the district court granted summary judgment for England.  The district court concluded that: 1) there was no evidence England fired Barlow for race-based reasons, or in retaliation for his workers' compensation claim; 2) Barlow performed his janitorial work as an independent contractor, not an employee, and thus could not assert a claim for wrongful discharge from that position; and 3) Barlow's status as an independent contractor precluded an FLSA claim for overtime.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand.  We affirm with regard to Barlow's claims for race discrimination and violation of the FLSA.  We reverse and remand, however, with regard to his state-law claim for wrongful discharge.

---

[1] Barlow is African American.  He filed claims for race discrimination in violation of 42 U.S.C. § 1981 as well as Title VII of the Civil Rights Act of 1964.  This opinion follows the district court and parties' convention of dealing with these claims together.

# I

In February 2005, Barlow began working as a part-time security guard at a Denver maintenance yard operated by England, a large trucking company. Barlow patrolled England's grounds for about thirty hours a week, from 6:30 P.M. to 5:00 or 6:00 A.M. Friday through Sunday nights. Most of the yard was fenced in, accessible through an automatic overhead gate. Barlow also performed maintenance and ground work to try to reach 40 hours of work per week.

After Barlow had been at England for about a year and a half, he asked the facility's site manager, John Smith, for extra work. Smith, who had initially hired Barlow, was not satisfied with England's janitorial contractor at that time, so he asked England's personnel department about having Barlow take over. Smith was told he could not allow Barlow to work any more hours because the company would have to pay overtime.

To get around this, Smith suggested Barlow create a company England could contract with. Barlow formed E&W Janitorial & Maintenance Services, LLC. Beginning in February 2007, Barlow cleaned for England on Mondays, Wednesdays, and Saturdays, pursuant to an oral agreement with Smith. On a few occasions, his girlfriend, a co-owner of E&W, filled in. England provided his cleaning supplies, but did not require Barlow clean in any particular order. England, the only company for which E&W worked, paid $400 a month for E&W's services.

On June 6, 2007, Barlow was injured when the heavy gate securing the entryway

3

at England's facility malfunctioned and fell on his head.  Barlow reported the incident to England's workers' compensation manager, Darlene Niebuhr, and then filed for and began to receive workers' compensation.  He continued to do security, maintenance, and janitorial work for England, subject to a twenty-five pound lifting restriction imposed by his doctor.

In November 2007, a driver told Smith that Barlow had criticized Smith and the way he ran the Denver yard.  Based on this account, Smith told Niebuhr that he planned to terminate Barlow.  But when Smith confronted Barlow about the matter, Barlow denied the driver's accusations.  Lacking proof, Smith took Barlow at his word and withheld discipline.

In December 2007, though, Smith terminated England's contract with E&W.  He cited two reasons.  First, Smith said he had caught Barlow doing janitorial work during his security guard shift on three occasions, even though he had warned Barlow not to do this.  For his part, Barlow claims he never mixed the two jobs.

Second, Smith cited Barlow's workers' compensation status.  He testified:

> What led to the termination of [the janitorial-services contract] was two factors: one, the—the double activity, and also because of the workman's comp issue.  It was starting to put us in an unfavorable light, because with what was required to do the janitorial job, it could come back on both of us as far as—because the mop bucket was—would be fairly heavy, because it was a 5-gallon mop bucket.  So you'd have to lift it up to drain it, and that is well over 25 pounds.

> And I did not feel that neither [sic] one of us needed to have that question of what he was doing.  So to prevent issues, I told him we needed to terminate that from both our interests.

4

Aplee. Supp. App. at 52-53.

In early 2008, Smith had received communications from other England employees which led him to believe the company suspected Barlow was malingering. Barlow had been receiving workers' compensation for nearly a year, and England personnel employees had started asking Smith questions about Barlow's status. Smith "perceiv[ed] . . . a certain level of uncomfortableness after this long a time." Aplt. App. at 229. He told Barlow "that because of the time factor, that he was getting into a spot to where [sic] people were doubting the duration of it, and he needed to find—get someone to find out what his problem was so he could get it corrected." Id. at 227. Smith testified that he did not doubt the validity of Barlow's injuries, but Niebuhr recalled that at some point Smith said "he was frustrated that [Barlow] was now changing his claim as to what happened, and that he was maybe seeking something that he may not be entitled to." Id. at 266–67. Barlow has stated that he gave doctor's reports to Smith on March 23 and April 10, 2008 that said he continued to have a twenty-five pound lifting restriction. On both occasions, Barlow says that Smith told him there was nothing wrong with him and he needed to do his job.

Smith and Niebuhr communicated about Barlow's workers' compensation claim several times in March and April 2008. In March, Niebuhr forwarded Smith a message she had received from Susan Olsen, a third-party claims adjuster, asking whether there was a warning sign on the premises about walking under the automatic gate. Olsen noted

5

in the email that Barlow's attorney was "getting very involved in the case" and that he was "now reporting vision loss." Aplt. App. at 277. She wrote, "I really hope there is a warning because I really want to decrease his benefits." Id. Smith also asked one of Barlow's coworkers to prepare a statement regarding his post-accident conversations with Barlow. Smith then faxed the statement to Niebuhr.

At some point, Olsen had Barlow placed under surveillance to determine whether he was working somewhere else and "doing more than he's claiming he's able to do." Id. at 265. Although neither Niebuhr nor Smith were involved in the decision to monitor Barlow, a series of emails between them shows they were both aware of it. The emails also revealed Neibuhr did not realize Barlow still worked for England. She thought Smith had already fired Barlow for allegedly complaining about Smith to the driver. Smith explained that, upon investigation, he had determined that termination was not warranted, as the "accusations proved to be a driver & a guard both running off at the mouth." Id. at 274. He added that Barlow was still employed and still had a lifting restriction. He concluded, "[I] can't do anymore [sic] than monitor & address as appropriate." Id.

Smith soon thereafter fired Barlow from his security guard position. This occurred after two trailer doors were stolen from England's premises during Barlow's security guard shift on the weekend of April 25, 2008. For several weeks prior, the doors had been left outside the fenced portion of the property, next to a dumpster, with discarded wood and pallets piled on top of them. Barlow never noticed the doors were missing.

6

When Barlow on April 30 reported for his next scheduled shift, Smith brought him and a coworker to his office. Barlow and Smith provide slightly differing accounts of what happened next. According to Barlow, the first thing Smith told him when the three of them were in the office was, "I am letting you go." Id. at 211. Barlow says Smith told him the doors were expensive and that he was being fired because he failed to notice they were gone and report it to Smith.

Smith, on the other hand, says he fired Barlow because Barlow failed to take responsibility for the missing doors. Smith said that he probably would have responded differently if Barlow had admitted his mistake. Smith noted that Barlow had walked past the doors three times the night they were stolen and must have seen them.

Barlow claims that he never said the doors were not his responsibility. But he also says he told Smith that the doors should have been in the secured area if they were valuable. Moreover, Barlow has continued to insist in this litigation that it was not his job to keep an inventory of what was on England's property. Smith, meanwhile, has not claimed that security guards were expected to inventory England's property, but he has said that "part of the security responsibilities are—is to note what's on site and then, if that changes while you're on duty, to let me know what's changed." Aplee. Supp. App. at 54. The termination evaluation form Smith prepared stated: "Trailer Doors stolen from lot during shift as guard, understand can't be at all places every minute but needs to note what is around shop & on next tour of area what isn't & report same." Aplt. App. at 166. Smith also noted on the form that Barlow's performance was good, and that he was

7

honest, stable, and dependable.

II

Barlow sued England, alleging race discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, wrongful discharge in violation of Colorado public policy, and a violation of the FLSA.[2] England moved for summary judgment, which the district court granted. Barlow v. C.R. England, Inc., 816 F. Supp. 2d 1093, 1107 (D. Colo. 2011).

### A. Race Discrimination

The district court concluded that Barlow did not establish a prima facie case of race discrimination under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Barlow, 816 F. Supp. 2d at 1100. The district court stated that Barlow "fail[ed] to address whether he has met his burden of establishing a *prima facie* case at the first step of the . . . burden shifting test," and instead "jump[ed] to the final stage of the three-part test and assert[ed] that 'there is ample evidence of pretext.' " Id. The district court concluded that Barlow had "not identified competent evidence that, if taken as true, would establish circumstances giving rise to an inference of discrimination."[3] Id.

_____

[2] Barlow also alleged a violation of the Americans with Disabilities Act. Because he has not appealed the district court's grant of summary judgment for England on that claim, we need not discuss it.

[3] Most of the district court's discussion here focused on an incident on which Barlow no longer relies in this appeal. In March 2008, at a lunch attended by Smith,

(continued...)

8

The district court further concluded that even if Barlow had established a prima facie case, England had proffered a legitimate, nondiscriminatory reason for terminating him. England's explanation was that Barlow "'failed to notice and report the stolen trailer doors, and more importantly, failed to accept that his position as a security guard made him responsible for being aware of what was on the C.R. England property, and to report missing property.'" Id. at 1102 (citation omitted). The district court determined that Barlow had not produced any evidence that this explanation was a pretext for race discrimination.

### B. Wrongful Discharge

The district court also rejected Barlow's claim that he had been discharged in violation of Colorado public policy, which provides that an employer may not retaliate against an employee for applying for and receiving workers' compensation. As regards the wrongful discharge claim, the district court noted, "[t]hough not entirely clear, Plaintiff's wrongful discharge claim appears to be premised on both the decision to end the janitorial-services contract in November 2007 and the decision to terminate Plaintiff from his security guard employment in April 2008." Id. at 1105.

Turning first to Barlow's termination from the security guard position, the district

---

[3](...continued)
Barlow, and others, a white coworker told a Richard Pryor joke that included the word "nigger." Barlow, 816 F. Supp. 2d at 1097-98. The district court noted the absence of any "nexus between the purportedly offensive joke and Mr. Smith's decision to terminate Plaintiff or the other Employment and Business Decisions." Id. at 1101. Barlow makes no reference to the joke in his appellate briefs.

court reasoned that although Niebuhr and Olsen had been suspicious of Barlow's claim, "nothing in the record indicates that Ms. Niebuhr or the third-party claims adjuster were involved in Mr. Smith's termination decision or that Mr. Smith was involved in the processing or handling of Plaintiff's workers' compensation claim." Id. The district court then addressed the termination of the janitorial services contract and concluded that Barlow "did not perform janitorial services as an at-will employee." Id. at 1106. Thus, the district court stated that Smith's termination of the E&W janitorial services contract and his comments about the "workman's comp issue . . . starting to put both of us in an unfavorable light" were irrelevant to Barlow's wrongful discharge claim. Id. at 1105-06. In any event, the district court interpreted Smith's "unfavorable light" statement as an innocuous concern that Barlow's "provision of janitorial services would only serve to aggravate his injuries for which he was then receiving workers' compensation as a security guard employee." Id. The district court also noted that Smith said Barlow did janitorial work while on the clock as a security guard. Id. "Therefore, the [district court concluded] that no reasonable jury could find that Mr. Smith ended the janitorial services contract in retaliation for Plaintiff's workers' compensation claims as a security guard employee." Id.

### C. Fair Labor Standards Act

Finally, the district court rejected Barlow's claim that England was required to pay him overtime for the hours he worked as a janitor. Applying the "economic reality" test, the district court held that Barlow was an independent contractor, and not an employee,

10

when he provided cleaning services for England through his own company.

## III

Barlow challenges the district court's decision to grant summary judgment on these claims. "We review the grant of summary judgment de novo, applying the same standards as the district court pursuant to Federal Rule of Civil Procedure 56(c)." Borchardt Rifle Corp. v. Cook, 684 F.3d 1037, 1041-42 (10th Cir. 2012) (citations and quotations omitted). "Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. at 1042. Under this standard, we hold the district court properly dismissed the federal claims, but reverse and remand on the state-law claim.

### A. Race Discrimination Claims

On appeal, Barlow raises three arguments related to his race discrimination claims under 42 U.S.C. § 1981(a) and Title VII of the Civil Rights Act of 1964. First, he argues the district court erred in concluding that he did not establish a prima facie case of race discrimination under the McDonnell Douglas framework. The court erred, he says, because England failed to even argue the lack of a prima facie case in its motion for summary judgment. In any event, he argues that he made out a prima facie case of race discrimination. Second, Barlow disputes the district court's conclusion that he failed to demonstrate that England's explanation for his termination was pretextual. Finally, he argues that the district court required him to prove more than pretext, improperly applying

11

a "pretext-plus" standard to his race discrimination claim. We conclude Barlow failed to present a prima facie case and affirm the district court's decision.

Without direct proof of discrimination, a plaintiff in a race discrimination case must rely on the three-part, burden-shifting framework set out by the Supreme Court in McDonnell Douglas. Under this framework, the plaintiff must first put forth a prima facie case of discrimination. Khalik v. United Airlines, 671 F.3d 1188, 1192 (10th Cir. 2012). Only after the plaintiff clears this initial hurdle does the burden shift to the employer to prove a "legitimate, non-discriminatory reason for the adverse employment action." Id. If the plaintiff does not establish a prima facie case, his entire case fails. McDonnell Douglas, 411 U.S. at 802 ("The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination.").

"The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." Plotke v. White, 405 F.3d 1092, 1100 (10th Cir. 2005) (citation and quotations omitted). The parties argue about the precise elements of this test, but the plaintiff's articulation of his prima facie case may vary depending on the nature of the claim. See id. Most generally, a plaintiff must demonstrate: "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." Salguero v. City of Clovis, 366 F.3d 1168, 1175

12

(10th Cir. 2004). Plaintiffs can establish evidence of the third prong in various ways, such as "actions or remarks made by decisionmakers," "preferential treatment given to employees outside the protected class," or "more generally, upon the timing or sequence of events leading to plaintiff's termination." Plotke, 405 F.3d at 1101 (citation and quotation omitted). Plaintiff can also show he was terminated and replaced in a job he was qualified for, "because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement." Perry v. Woodward, 199 F.3d 1126, 1140 (10th Cir. 1999).

As the district court held, Barlow here failed to present evidence linking the termination to "an inference of discrimination." Plaintiff introduced on the record only one "racially-charged situation" in his three years at C.R. England: "an ill-advised joke that involved the N-word" told by another employee in Smith and Barlow's presence. Barlow, 816 F. Supp. 2d at 1101. The district court concluded there was no nexus established between the joke and Smith's decision to fire Barlow. Further, Barlow does not rely on the ill-advised joke on appeal.

Instead, Barlow raises for the first time on appeal two additional arguments. First, he says the events leading to the termination of his security position raise an inference of discrimination. Second, Barlow attempts to argue that an alleged failure to eliminate his position suggests an inference of discrimination, even though he was fired for poor performance and not random reasons.

13

Even if these allegations sufficed to create an inference of discrimination, Barlow failed to fulfill his burden to establish a prima facie case by pleading them in district court. Barlow essentially concedes this, arguing he did not do so because England allegedly did not raise the lack of a prima facie case as a defense. But the defendant does not have the burden to disprove a prima facie case; rather, the plaintiff bears the initial burden of pleading one. And "absent extraordinary circumstances," which are not shown here, we need not consider arguments raised for the first time on appeal. Valdez v. Squier, 676 F.3d 935, 950 (10th Cir. 2012) (citation and quotation omitted).

We therefore agree with the district court that Barlow failed to establish a prima facie case of discrimination on his Title VII and 1981 claims. As a result, we need not address the pretext issues.

### B. FLSA claims

We also agree with the district court's decision to grant summary judgment against Barlow regarding his FLSA claims. Barlow argues that he performed his janitorial work as an employee under the FLSA, and that he was therefore entitled to overtime pay. But applying the "economic realities" test of employee status, we conclude that Barlow was not a statutory employee for purposes of the FLSA.

The "economic realities" test seeks to look past technical, common-law concepts of the master and servant relationship to determine whether, as a matter of economic reality, a worker is dependent on a given employer. Baker v. Flint Engineering & Const. Co., 137 F.3d 1436, 1440 (10th Cir. 1998). "The focal point in deciding whether an

14

individual is an employee is whether the individual is *economically dependent* on the business to which he renders service, or is, as a matter of economic fact, in business for himself." Doty v. Elias, 733 F.2d 720, 722–23 (10th Cir. 1984) (emphasis added) (citations omitted). "In applying the economic reality test, courts generally look at (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business." Baker, 137 F.3d at 1440. It also "includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records." Id. "None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach." Id.

Some factors favor Barlow, while other factors favor C.R. England, but, ultimately, we agree with the district court that Barlow was an independent contractor. Barlow and his partner created a licensed, limited liability company in order to provide janitorial services. Cf. Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947) (classifying as employees speciality group of production line workers in part because "[t]he group had no business organization that could or did shift as a unit from one slaughter-house to another"). Barlow kept records for the company, opened a separate bank account, and filed a corporate tax return. The district court also noted Barlow had

15

the "freedom to decide how to accomplish" his tasks, even if the company reviewed the ultimate work product. 816 F. Supp. 2d at 1107. Indeed, little in the case indicates the relationship between Barlow and C.R. England materially differed from one the company would have with any other cleaning service except for the fact Barlow also happened to otherwise be an employee. This suggests Barlow was in business for himself as a janitor, and we therefore affirm the district court's decision to grant summary judgment.

### C. Discharge in Retaliation for Barlow's Workers' Compensation Claim

We do, however, reverse the district court's decision regarding the wrongful discharge claim. Barlow challenges the district court's wrongful termination conclusions, contending that he performed cleaning services as an employee and that a jury could find that he was terminated from both of his positions in retaliation for his workers' compensation claim. We conclude first that Barlow made out a prima facie case of retaliatory discharge with regard to his security guard termination. As for the claimed wrongful discharge from the janitorial contract, we remand for further findings.

### 1. Wrongful Discharge from Security Guard Position

It is well established that an employer violates Colorado public policy by discharging an employee in retaliation for applying for and receiving workers' compensation benefits. See Barlow, 816 F. Supp. 2d at 1105 (citing Miedema v. Browning–Ferris Indus. of Colo., 716 F. Supp. 1369, 1371-72 (D. Colo. 1989); Lathrop v. Entenmann's, Inc., 770 P.2d 1367, 1373 (Colo. Ct. App. 1989)). A plaintiff makes a prima facie case of wrongful discharge against public policy by presenting evidence:

16

> [1] that the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited him from performing a public duty or exercising an important job-related right or privilege; [2] that the action directed by the employer would violate a specific statute on the public health, safety or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or his right or privilege as a worker. The plaintiff must also show [3] that the employee was terminated as the result of refusing to perform the act directed by the employer, and [4] that the employer was aware or reasonably should have been aware that the employee's refusal to comply with the employer's order was based on the employee's reasonable belief that the action ordered was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker.

Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1235 (10th Cir. 1997) (citing Martin Marietta Corp. v. Lorenz, 823 P.2d 100, 109 (Colo. 1992) (en banc)).  The only element in dispute is whether Barlow has established a causal link between his exercise of his right to workers' compensation and his termination from his security guard position.  Viewing evidence in the light most favorable to him as the non-moving party, we conclude he has.

In his briefs, Barlow lays out a number of ways Smith was involved in England's handling of Barlow's claim.  In March 2008, after Barlow had been receiving workers' compensation for approximately nine months, Smith knew that people at England, including Niebuhr and Smith's boss, were becoming skeptical of Barlow's claim.  Smith explained, "[a]fter one year of workman's comp, it puts [] everybody in an uncomfortable position because . . . after so long, people start questioning, Is this a real issue or not?"[4]

---

[4] Smith appears to have confused his dates somewhat.  He testified that by March
(continued...)

17

Aplt. App. at 227.  Smith also told Barlow about these concerns.

Around the same time, Smith learned from an e-mail Niebuhr forwarded that Barlow's attorney was getting "very involved in the case." Id. at 277.  Niebuhr asked Smith for help responding to the third-party claims adjuster's queries, such as whether the security gate had a warning sign.  Smith also had one of Barlow's coworkers prepare a statement about potentially conflicting accounts Barlow had given of his injury, which Smith then faxed to Niebuhr.  And in April 2008, Niebuhr sought Smith's assistance in investigating Barlow's ongoing eligibility for workers' compensation, asking if Smith knew where Barlow was working.

Further, although Smith says that he never questioned the legitimacy of Barlow's injuries, both Niebuhr and Barlow say otherwise.  Niebuhr testified that Smith questioned Barlow's injuries and "was frustrated that [Barlow] was now changing his claim as to what happened, and that he was maybe seeking something that he may not be entitled to." Aplt. App. at 266–67.  And according to Barlow, Smith twice doubted whether the lifting restriction in Barlow's doctor's reports was really necessary.

Finally, Barlow notes that Niebuhr expressed frustration, or at least confusion, to Smith when she learned in late April 2008 that Barlow had not been fired over his alleged comments about Smith.  She wrote that she was "a little confused" because she thought Barlow had been fired, and added, "So let me get this straight—he is still working for us

_____

[4](...continued)
2008, Barlow had been receiving benefits for over a year.  Aplt. App. at 237.  In fact, Barlow was only injured in June 2007.

18

and doing his regular job?????? Without restrictions?" <u>Id.</u> at 274. Six days after Niebuhr sent this email, Smith fired Barlow from his security guard position. This email chain provides some support for Barlow's wrongful discharge claim. Niebuhr's comments could be taken as an expression of frustration that Barlow was collecting benefits to which he was not entitled if he was able to work without restrictions.[5] Contrary to the district court's conclusion, this all suggests Smith questioned Barlow's injuries and had a role in the handling of his workers' compensation claim.

Further, we agree with Barlow that Smith's direct involvement in the processing of workers' compensation claims should not, in any event, be a necessary part of a prima facie wrongful discharge case. Colorado law requires that an employer "was aware, or reasonably should have been aware" that the employee's actions were legally protected. <u>Lorenz</u>, 823 P.2d at 109. England cites no case for the proposition that only a supervisor who has worked closely with the employer's workers' compensation manager may carry out a retaliatory discharge. Barlow has presented evidence that Smith was fully aware that his boss and his company's workers' compensation manager were questioning Barlow's workers' compensation claim, that Smith helped investigate Barlow's continued receipt of workers' compensation benefits, and that he was himself frustrated with Barlow's assertions regarding his injury and entitlement to benefits. This is all

---

[5] Smith stated in the same email chain that he had inquired about obtaining a security guard from a staffing agency. England points out, and Barlow acknowledges, that Barlow misstates the record when he asserts that Smith made this inquiry shortly before he fired Barlow. <u>See</u> Aplee. Br. at 39; Aplt. Reply Br. at 13 n.1. In fact, the record does not show when Smith contacted the agency. Aplt. App. at 274.

19

circumstantial evidence of a causal relationship between Barlow's receipt of workers' compensation benefits and his termination.

Finally, temporal proximity also weighs in Barlow's favor. In the context of the Family and Medical Leave Act, we have recognized that close temporal proximity between the exercise of a right and an employee's discharge may alone constitute prima facie proof of causation. Compare Ramirez v. Okla. Dept. of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994) (a lapse of one and a half months was adequate to establish prima facie causation), overruled on other grounds by Ellis v. University of Kansas Medical Center, 163 F.3d 1186, 1194 (10th Cir. 1998) with Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three months, without other evidence suggesting causation, was insufficient); see also Trujillo v. PacifiCorp, 524 F.3d 1149, 1157 n.5 (10th Cir. 2008) (collecting Tenth Circuit cases). England argues that timing does not support Barlow's case because more than ten months passed between Barlow's filing for workers' compensation and his termination. Further, England argues that the limited nature of Smith's role in handling the workers' compensation claim renders the close proximity between Niebuhr's last email and Barlow's discharge irrelevant.

But both arguments overlook the fact that Colorado law protects an employee's ongoing receipt of workers' compensation benefits, not just the employee's initial filing. See Lathrop, 770 P.2d at 1373 ("[S]ince an employee is granted the specific right to apply for *and receive* compensation under the Act, an employer's retaliation against such an employee for his exercise of such right violates Colorado's public policy.") (emphasis

20

added).  The evidence suggests that as Barlow approached a year of receiving benefits, England became increasingly suspicious of and frustrated with his claim.  Shortly after Smith became more involved in investigations into Barlow's ongoing eligibility, he fired Barlow.  This sequence of events favors Barlow.

As a final note, we reject England's argument that Smith had no reason to terminate Barlow because, at the time he was fired, "termination would do nothing to reduce the benefits available pursuant to his claim."  Aplee. Br. at 40–41.  If England lacked a direct monetary incentive for retaliating against Barlow's exercise of workers' compensation rights, the same can be said with regard to any other employer accused of the same violation.  Obviously, this reality does not preclude liability under Colorado law.  See Lathrop, 770 P.2d at 1368-69 (reversing summary judgment for employer where employee filed for workers' compensation in 1982, received a settlement of his claim in 1985, and was fired in 1986).

We therefore conclude that Barlow has raised a genuine issue of material fact as to whether he was fired from his security position in retaliation for exercising his right to receive benefits from his workers' compensation claim.  Because England alleges it also had a legitimate reason for firing Barlow from his security guard position, we have a mixed-motive question of causation.  This remains as a question of material fact that survives summary judgment.  See, e.g.,  Webster v. Konczak Corp., 976 P.2d 317, 321 (Colo. App. 1998) (noting in retaliatory discharge case that "[w]hile defendants presented evidence in conflict with the above version of events, as well as evidence that plaintiffs

21

had been fired for poor job performance, this simply demonstrated that this was an issue of material fact that precluded entry of summary judgment").

## 2. *Wrongful Discharge from Janitorial Contract*

As for any wrongful discharge claim arising from the termination of the janitorial contract, we remand for further findings. From a review of the district court's rulings, it is unclear whether federal or state law was applied in determining Barlow's employment status for purposes of his wrongful discharge claim. See Barlow, 816 F. Supp. 2d at 1106. And, more specifically, it is unclear what rationale the district court in fact applied in concluding Barlow was an independent contractor, or its basis for concluding that this status necessarily negated his wrongful discharge claim.

Because the district court's further findings might resuscitate Barlow's wrongful discharge claim as regards the janitorial contract, we must also review the district court's discussion of causation. Although the district court concluded Barlow's alleged independent contractor status made the termination of the janitorial contract irrelevant to his wrongful discharge claim, it also concluded in the alternative that the circumstances under which the contract was terminated did not suggest retaliation. We conclude the district court erred in determining that Barlow failed to present sufficient evidence to survive summary judgment.

The district court focused on Smith's explanation for terminating the contract. It concluded that when Smith mentioned "the workman's comp issue" and Barlow having to lift a five-gallon mop bucket, Smith was concerned that "Plaintiff's provision of janitorial

22

services would only serve to aggravate his injuries for which he was then receiving workers' compensation as a security guard employee." Barlow, 816 F. Supp. 2d at 1106. It also noted Smith's concern about Barlow doing janitorial work during his security shifts. Id.

Neither of these rationales suffices to dismiss the wrongful discharge claim at the summary judgment stage. Viewing the evidence in the light most favorable to Barlow, a jury could also view Smith's statement about workers' compensation as an expression of skepticism with regard to Barlow's injuries or even frustration that Barlow was receiving workers' compensation while still doing physically demanding janitorial work. Smith said that the "workman's comp issue . . . was starting to put us in an unfavorable light." Aplee. Supp. App. at 52. He explained the mop bucket weighed more than Barlow was supposed to be lifting, and said that "neither one of us needed to have that question of what he was doing." Id. at 52–53. "So to prevent issues," he concluded, "I told him we needed to terminate that from both our interests." Id. at 53. This explanation is not entirely clear, and we conclude that a reasonable jury could view it as a statement that Smith did not believe Barlow was entitled to collect both workers' compensation benefits and a monthly payment for janitorial work. It is, then, an admission that Barlow was fired because he was receiving workers' compensation. Such a statement, without more, suggests that Barlow "was terminated as the result of" his claim for and his ongoing receipt of benefits.

Smith's second explanation—that Barlow was "double-dipping"—does not change

23

this conclusion. First, Barlow disputes Smith's claim that he did janitorial work during his security guard shifts. Second, if he was in fact "double-dipping", this raises a mixed-motive question of material fact which would survive summary judgment. As a result we cannot affirm on the district court's alternative ruling that Barlow failed to establish causation.

## IV

We thus AFFIRM with regard to Barlow's claims for race discrimination and violation of the FLSA. We, however, REVERSE and REMAND for further proceedings with regard to Barlow's wrongful discharge claim for termination in violation of Colorado public policy. As all of Barlow's federal claims have been dismissed, we leave it to the district court to decide in the first instance whether it will continue to exercise supplemental jurisdiction over the state-law claim. See 28 U.S.C. § 1367(c)(3) ("The district courts *may* decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction.") (emphasis added); see also Carlsbad Technology, Inc. v. HIF Bio, Inc., 556 U.S. 635, 640 (2009) ("Upon dismissal of the federal claim, the District Court retained its statutory supplemental jurisdiction over the state-law claims. Its decision to exercise that statutory authority [in declining to exercise supplemental jurisdiction over the state-law claims] was not based on a jurisdictional defect but on its discretionary choice not to hear the claims despite subject-matter jurisdiction over them.").