**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 4, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ANTHONY CLINCY,

     Plaintiff - Appellant,

v.

TRANSUNION LLC; BILL SAWYER,
in his individual capacity; PATRICK
NORTON, in his individual capacity;
MARK TEUSS, in his individual
capacity,

     Defendants - Appellees.

No. 16-4029
(D.C. No. 2:14-CV-00398-JNP)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **HARTZ**, Circuit Judges.
_____

Anthony Clincy appeals from the district court's order for summary judgment

in favor of Transunion LLC, Bill Sawyer, Patrick Norton and Mark Teuss[1] on his

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Mark Tussie, a Transunion human resources employee, was incorrectly named
as Mark Teuss.

claim for race discrimination in violation of 42 U.S.C. § 1981.[2]  Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Mr. Clincy, an African American, began working for Transunion as a sales

representative in 1993.  By all accounts, he was a good employee—he was promoted

in 1997 and 2000, and received numerous merit pay increases over the years.  He was

terminated in 2010, however, for what Transunion determined was a violation of its

Code of Business Conduct.[3]

Mr. Clincy was terminated as a result of what Transunion perceived as an

attempt to improperly redirect revenue from two accounts for his own financial

benefit.  Some background regarding Transunion's business practices is helpful here.

Transunion assigns codes to its customers.  For example, accounts generating less

than $45,000 in annual revenue are assigned to the Client Services unit and given a

CS code, and accounts generating between $45,000 and $250,000 in annual revenue

are assigned to a Field unit, and given a Field code.  The code determines, among

other things, which sales representative will receive a commission.  Codes can only be

transferred or changed mid-year or at the start of the year.  An account with a Field

code could benefit Mr. Clincy, whereas an account with a CS code could not.

---

[2]  Mr. Clincy does not appeal the district court's summary judgment order in favor of defendants on his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference with contractual relations.

[3] The Code requires employees like Mr. Clincy, among other things, to "[u]phold the highest standards of ethical conduct."  Aplt. App., Vol. 1 at 288.

The first incident which drew management's attention to Mr. Clincy involved the Amp Alarm[4] account. When Amp first became a customer in early 2009, the account was predicted to generate less than $45,000 in annual revenue. It was therefore assigned to the Client Services unit and given a CS code. But by mid-2009, Amp's revenue prospects improved, and Mr. Clincy arranged for Amp to also have a Field code. Because pricing was more favorable under the Field code, Amp asked Mr. Clincy to cancel the CS account and issue a credit. Mr. Clincy gave the request to the Credit Services department. On December 15, 2009, Client Services Manager Paul Arena, told Mr. Clincy that he would "waive the last month's fee and cancel the [CS] code . . . *if* the transfer option is still open." Aplt. App., Vol. 2 at 322 (emphasis added). Mr. Arena, however, did not commit to any particular course of action if the transfer option was foreclosed, but he did instruct Mr. Clincy not to do anything else until an agreement was in place:

> From what I can see, the account was owned by CS and we were not notified of any field activity nor was there any request to transfer the code midyear or end of year. Based on ownership change guidelines, the field and CS must have a conversation and agree on a change in ownership before an account would move. No [further] action should be taken by [you] until agreement is reached.

*Id*. at 322-23.

Minutes after sending the email to Mr. Clincy, Mr. Arena emailed Michael Miele, Vice President of Client Services (eventually copying William Pancoast,

---

[4] The district court's decision refers to Amp Alarm as EnGuarde. EnGuarde, however, is a software platform used by alarm companies such as Amp. Therefore, the company is properly referred to as Amp Alarm.

3

Manager of Relationship Sales in the CS unit), expressing concern about Mr. Clincy's action:

> Mike—here is an example where a field rep spoke to a CS client and *simply created a new code* to have the rev[enue] run to them instead of CS. I would recommend we have a conversation with Mike Jones & team to ensure this practice is not common nor repeated. We have no method to track or stop this practice, only communication with our peers.
>
> *Id*. at 322 (emphasis added).

Even though there was no resolution regarding the availability of the transfer of the Amp account to a Field Code, on January 5, 2010, Mr. Clincy instructed his administrative assistant, Joanne O'Leary, to "cancel [the] AMP client services code and credit the monthly min[imum] for the month[] of December." Aplee. Supp. App. at 30. He further directed her to "add" his Field code and "delete" the CS code in the database. *Id*. at 33. At or near the same time, Mr. Clincy directed code changes to Elite Home Security's account that redirected revenues from Client Services to himself.

Mr. Clincy's actions raised red flags with management and the matter was investigated by a group of managers that included Messrs. Pancoast and Miele, Western Region Vice President Bill Sawyer, and Senior Vice President Mike Jones. Following the investigation, on January 14, 2010, Mr. Clincy met in person with Messrs. Sawyer and Norton, and Mark Tussie, a human resources employee, participated by telephone. According to the agenda, the purpose of the meeting was to "present the facts to [Mr. Clincy] and hear his response." *Id*. at 49.

4

Mr. Tussie's notes of the meeting reflected that "Mr. Clincy was apologetic [and said that he] 'knew what he did was wrong.'" *Id*. at 46. Mr. Clincy further explained that "'if he [had] known the amount [of revenue diverted] was so high[,] he would not [have] changed the code [because] that would be pirating.'" *Id*. Mr. Clincy further admitted that he was aware of the proper procedures to change codes, but did not follow them with respect to the Amp Alarm and Elite Home Security accounts. *See id*. at 51. At the end of the meeting, Mr. Clincy was suspended with pay until further notice.

On January 19, 2010, Messrs. Sawyer and Tussie called Mr. Clincy and informed him that his employment was terminated. That same day, Transunion wrote to Mr. Clincy that his conduct violated the "TransUnion Business Principles and Code of Business Conduct as outlined in the Associate Handbook under Core Business Principle Number One, Ethics and Values." *Id*. at 53.

Mr. Clincy subsequently brought this action claiming that his employment was terminated because of his race in violation of 42 U.S.C. § 1981. Mr. Clincy contends he did nothing wrong and that Transunion trumped up the ethics violation as grounds for termination when the real reason was because he is an African American. The district court determined that Mr. Clincy failed to meet his burden to establish a prima facie case of race discrimination, and granted summary judgment for defendants. In particular, the court found that Mr. Clincy failed to demonstrate that he was terminated under circumstances giving rise to an inference of discrimination. This appeal followed.

5

## ANALYSIS

"We review the grant of summary judgment de novo, applying the same standards as the district court pursuant to Federal Rule of Civil Procedure 56[]." *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 504 (10th Cir. 2012) (internal quotation marks omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Because there was no direct proof of discrimination, Mr. Clincy was required to "rely on the three-part, burden-shifting framework set out . . . in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]. Under this framework, the plaintiff must first put forth a prima facie case of discrimination." *Barlow*, 703 F.3d at 505.

To establish a prima facie case "[m]ost generally, a plaintiff must demonstrate: (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." *Id.* (internal quotation marks omitted). The plaintiff has the burden of establishing a prima facie case "by a preponderance of the evidence." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (internal quotation marks omitted).

Before the district court, defendants argued at length that Mr. Clincy failed to demonstrate the third element of a prima facie case—that the circumstances surrounding his termination gave rise to an inference of discrimination. The court noted that Mr. Clincy's response regarding the prima facie case was contained in two

6

sentences—as an African-American he is the member of a protected class and he suffered an adverse employment action, i.e. termination  The district court noted Mr. Clincy made no attempt to establish the second and third prongs of his prima facie case: that he was qualified and satisfactorily performing his job, and that he was terminated under circumstances giving rise to an inference of discrimination.  These failings caused the court to conclude that Mr. Clincy's failure to argue the issue as required by Fed. R. Civ. P. 56 and the local rules, was "reason alone . . . [to] grant the defendants' motion[] for summary judgment on [the race discrimination] claim." Aplt. App., Vol. 1 at 173.

Nonetheless, the court stated that "[e]ven [if it] ignore[d] the inadequacy of the briefing and consider[ed] arguments Mr. Clincy *could* have made based on the facts presented in the memoranda, he would still have failed to establish a prima facie case." *Id*. at 174.  The only facts connected to race were:  (1) an alleged lack of racial diversity among Transunion's sales force; and (2) Transunion's failure to terminate Mr. Clincy's administrative assistant and supervisor,[5] both Caucasians, for their roles in changing the codes.  The district court concluded none of these facts gave rise to an inference of discrimination.  We agree.

---

[5] Mr. Clincy appears to be referring to the Western Region Vice President, Bill Sawyer, as the supervisor involved in approving the code changes, but his arguments and evidentiary support for this assertion are unclear.  We will assume for our resolution of this appeal that Mr. Clincy intends to reference Bill Sawyer as the supervisor involved.

First, Mr. Clincy argues that an inference of discrimination exists because he "was the only black person in a 500-person sales force." Aplt. Opening Br. at 17. We agree with the district court that one method by which Mr. Clincy could have established an inference of discrimination was through statistical data that demonstrated a marked imbalance between African Americans and Caucasians in Transunion's sales force. However, more is needed to support the claims Mr. Clincy raises here. Specifically, "[w]e have long required that statistical evidence should be closely related to the issues in the case." *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1147 (10th Cir. 2009) (brackets and internal quotation marks omitted). Setting aside the lack of statistical evidence, Mr. Clincy failed to demonstrate that Transunion's overall employment practices had anything to do with its decision to terminate his employment.

Second, Mr. Clincy argues that an inference of discrimination exists because changing the codes "required the participation of his coworkers, but he was the only one terminated." Aplt. Opening Br. at 20. Again, we agree with the district court that another method by which Mr. Clincy could have established an inference of discrimination was by demonstrating that he was treated differently than similarly-situated, Caucasian coworkers. But as the district court found, Mr. Clincy did not show that these coworkers were in fact similarly situated:

> Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline. In determining whether two employees are similarly situated, a court should also compare the relevant employment circumstances, such as work history and company policies, applicable to

8

> the plaintiff and the intended comparable employees.  Moreover, even employees who are similarly situated must have been disciplined for conduct of comparable seriousness in order for their disparate treatment to be relevant.

*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (citations and internal quotation marks omitted).

Neither Ms. O'Leary nor the supervisor who allegedly approved an additional code had the same supervisor.  Further, there is no evidence that either Ms. O'Leary's or the supervisor's employment circumstances were the same as Mr. Clincy's, or that their conduct was of comparable seriousness.  Indeed, it was Mr. Clincy who told Ms. O'Leary, his subordinate, to make the code changes and he alone stood to reap a financial benefit.

Last, Mr. Clincy lists several reasons why his termination occurred under circumstances that gave rise to an inference of discrimination.  But these reasons cannot support an inference of discrimination because they depend on an unsupported premise, either that Mr. Clincy was treated differently than other similarly-situated employees, or that the decision to terminate his employment had something to do with his being Transunion's only African-American sales representative.

The judgment of the district court is affirmed.

9

Judge Hartz concurs in the judgment for the reasons stated in the opinion of the district court.

Entered for the Court

Mary Beck Briscoe
Circuit Judge