FILED
United States Court of Appeals
Tenth Circuit

December 2, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MONICA MORMAN, M.D., an individual,

    Plaintiff - Appellant,

v.

CAMPBELL COUNTY MEMORIAL
HOSPITAL; ROBERT MORASKO;
SARA HARTSAW, M.D.; NANCY
TARVER; HARVEY JACKSON; JOE
HALLOCK; ALAN L. MITCHELL, M.D.;
GEORGE DUNLAP; BROOK
BAHNSON, in their individual and official
capacities,

    Defendants - Appellees.

No. 14-8090
(D.C. No. 1:13-CV-00243-ABJ)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.
_____

Dr. Monica Morman is a board-certified orthopedic surgeon at Campbell

County Memorial Hospital (CCMH) in Gillette, Wyoming. She contends that CCMH

discriminated against her based on her gender by providing better facilities,

compensation, assistance, equipment, and advertising to its three male orthopedic

surgeons. Dr. Morman's sole claim is that the defendants, as state actors, violated her

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

equal-protection rights under the Fourteenth Amendment. She seeks redress for that violation under 42 U.S.C. § 1983. The district court dismissed Dr. Morman's lawsuit under Fed. R. Civ. P. 12(b)(6) and, alternatively, dismissed on qualified-immunity grounds the claim against CCMH's board members and Robert Morasko (CCMH's Chief Executive Officer) in their individual capacities.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm on both grounds. First, Dr. Morman has not pleaded a plausible gender-discrimination claim because, even accepting her facts as true, she and her three male colleagues were not similarly situated. CCMH employed the three male orthopedic surgeons as part of a multi-million-dollar purchase of the surgeons' Powder River Orthopedics & Spine, P.C. (PROS) business, including the surgeons' building, equipment, and practice. By contrast, CCMH employed Dr. Morman solely for her skill and experience. And second, the board members and Morasko are entitled to qualified immunity in their individual capacities because Dr. Morman has failed to show any clearly established law that would have put the defendants on notice that their acquisition terms would violate the Equal Protection Clause.

2

# I.  BACKGROUND

## A.  Facts[1]

Dr. Morman is a board-certified orthopedic surgeon, specializing in hand, wrist, and shoulder surgeries. She graduated from medical school in 1997. During the next eight years, she completed an orthopedic-surgery residency, became board-eligible under the American Board of Orthopaedic Surgery's standards, became board-certified for Orthopaedic Surgery under those same standards, completed a hand-surgery fellowship, and received her Certification of Additional Qualification in Hand Surgery.

For five years after her hand-surgery fellowship, from 2003 to 2008, Dr. Morman worked at PROS in Gillette, Wyoming. During this time, four other orthopedic surgeons owned PROS: Drs. Nathan Simpson, Hans Kioschos, John Dunn, and Gerald Baker. In 2008, Dr. Morman left PROS for a one-year fellowship at Massachusetts General Hospital. In 2009, after completing the fellowship, Dr. Morman returned to Gillette, Wyoming, and began working at CCMH, directly competing with PROS for clientele. Dr. Morman's contract with CCMH entitled her to both an annual base salary of $550,000 and biannual bonus payments based on her productivity. As bonus payments, Dr. Morman was entitled to 55% of all gross collections that CCMH received for her services in excess of $500,000 during each

---

[1] In reviewing a dismissal for failure to state a claim, we must "accept[] all well-[pleaded] facts as true and view[] them in the light most favorable to the plaintiff." *Barnes v. Harris*, 783 F.3d 1185, 1191–92 (10th Cir. 2015). As we discuss later, we distinguish well-pleaded facts from legal conclusions.

six-month bonus period. In earning her salary and bonuses, Dr. Morman felt hindered by CCMH's management of her practice. She argues that the hospital's policies placed her at a competitive disadvantage to nearby privately employed orthopedic surgeons, including those at PROS. In December 2011, she renegotiated her contract terms, getting a higher base pay of $58,333.34 per month plus $4,166.67 per month to be on call ($62,500 per month or $750,000 annually) in exchange for an increased revenue threshold before earning bonuses. Her base pay, however, was subject to reduction if collections from her professional services fell below certain threshold amounts. If she failed to meet those specified targets, her base salary for the next six months would be reduced to $45,833.33 plus $4,166.67 for call coverage.

In June 2012, CCMH agreed to a multi-million-dollar deal to purchase PROS (including the building, equipment, and practice) from its three remaining owners (Drs. Simpson, Kioschos, and Dunn), as well as to employ them at CCMH.[2] The district court explained that the different employment terms resulted from the great disparity in what the PROS male surgeons brought to the negotiating table as compared to what Dr. Morman had brought.

---

[2] As part of the deal, CCMH also purchased various assets from Bone & Joint Radiology, LLC for $4,000,000. These assets included: "[t]he digital x-ray equipment, MRI equipment and assumption of the lease, good will and blue sky, inventory, including supplies and stock in trade as of closing, furniture, fixtures, computer software and hardware used in connection with [Bone & Joint] Radiology's operations, medical records, patient charts, progress notes, reports and similar records." Appellant's App. vol. 2 at 180. PROS owned Bone & Joint Radiology, so PROS's three owners benefited from the asset sale.

## B. Procedural History

In October 2013, Dr. Morman filed her federal lawsuit, asserting a single claim against CCMH, its CEO, and its board members. The claim is one for gender-based discrimination under the Fourteenth Amendment, as enforced by 42 U.S.C. § 1983. In support of her claim, she alleged that the defendants treated her differently from the male orthopedic surgeons (who had owned PROS) by providing her with less-favorable pay and terms and conditions of employment. Specifically, in her complaint, Dr. Morman identified six ways in which the defendants had discriminated against her based on gender:

- CCMH allowed the PROS surgeons to continue operating under the name "Powder River Orthopedics & Spine." In contrast, although Dr. Morman's orthopedic clinic at CCMH was originally called "Orthopaedic Specialists of Wyoming—a CCMH Clinic," CCMH, soon after she began work, changed the name to "Campbell County Clinic—Orthopedics." In Dr. Morman's view, the name "County Clinic" put her at a competitive disadvantage by conveying an image of "free clinics for the indigent" and "substandard care." Appellant's App. vol. 1 at 14.

- CCMH funded PROS's existing advertising campaign, which was more aggressive than the advertising for Dr. Morman's clinic.

- CCMH purchased the building that had previously housed the PROS surgeons' private orthopedic practice and allowed them to continue practicing out of it, providing them with a superior office space to Dr. Morman's. She argued that her office was insufficient for her practice and that the inadequate space resulted in inefficiencies and disorganization.

- CCMH allowed the PROS surgeons to hire and fire their own staff and to manage their own billing. CCMH also paid them a management fee to run the practice. By contrast, Dr. Morman argued that CCMH disallowed her from managing her clinic, kept her from hiring or firing staff, did not provide her onsite billing, and denied her a full-time office manager for her practice.

- CCMH did not provide Dr. Morman with onsite radiology equipment, but CCMH purchased the PROS surgeons' radiology equipment and allowed them to continue to maintain radiology services onsite.

- CCMH allowed the PROS surgeons to maintain their ownership in an outside imaging and surgery center, but it kept Dr. Morman from establishing an ownership interest in any center competing with CCMH.

Dr. Morman claimed that these facts demonstrate CCMH discriminated against her based on gender. She alleged in her complaint that she has been employed by CCMH longer and "is more highly qualified than [the PROS surgeons] because, unlike the three male doctors, she has completed both a hand surgery fellowship and a shoulder surgery fellowship." Appellant's App. vol. 1 at 23. Accordingly, she contended that the differential treatment "was performed knowingly, intentionally and maliciously to deprive Dr. Morman of her rights under the United States Constitution." *Id.*

In response, the defendants filed a Rule 12(b)(6) motion to dismiss, asserting that Dr. Morman had failed to state a claim upon which relief could be granted. After full briefing, the district court granted the motion. It concluded that the PROS surgeons and Dr. Morman were not similarly situated, defeating her equal-protection claim. It noted that CCMH had hired the PROS surgeons as part of negotiations to purchase their private practice, putting the PROS surgeons in a dissimilar (and stronger) bargaining position than Dr. Morman. Because of this difference, the district court concluded that the parties were not similarly situated and that Dr. Morman had failed to plead a plausible claim for relief. Alternatively, the district court held that the board members and Morasko were entitled to qualified immunity in their individual capacities.

6

## II.     DISCUSSION

On appeal, Dr. Morman contends that the district court erred by dismissing her claim. She argues that the district court "exceeded its authority when it weighed the evidence and made a factual determination as to whether Dr. Morman was similarly situated to her male peers." Appellant's Opening Br. 27. She also asserts that the district court applied the incorrect legal standard, arguing that Fed. R. Civ. P. 8(a) requires her to provide only a short and plain statement of a plausible claim to give the defendants notice of the nature of the claim and grounds upon which it rested.[3] She argues that she did just that. Further, she contends that the district court erred in granting qualified immunity to the board members and Morasko in their individual capacities because the differential treatment "violated her clearly established constitutional right to be free from gender discrimination in the workforce." *Id.* at 28. We disagree with both arguments.[4]

---

[3] Rule 8(a) provides:

A pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

[4] The board members and Morasko also argued at the district court and on appeal that they are protected by absolute legislative immunity. Because of our conclusions on the other issues, we need not address this claim.

## A.    Standard of Review

We review de novo a district court's dismissal granted under Rule 12(b)(6). *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). But as we do so, Dr. Morman argues that we need ask only if she satisfied the liberal pleading standard of Rule 8(a). She's right. But she is mistaken as to what Rule 8(a) requires. The Supreme Court has recently devoted considerable attention to clarifying the standard used to evaluate a Rule 12(b)(6) motion to dismiss. In her argument, Dr. Morman ignores these recent developments in the pleading standard as announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

In *Twombly*, the Supreme Court clarified the relationship between Rules 8(a) and 12(b)(6). The Court explained that, to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A plaintiff must "nudge[] [her] claims across the line from conceivable to plausible." *Id.* Mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.* at 555.

The Court expanded upon this in *Iqbal*. There, examining the effect of a complaint's legal conclusions, the Court explained that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable." *Iqbal*, 556 U.S. at 678. As the Court noted, "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.*

8

at 678–79. We assume the veracity of well-pleaded facts, but we must "then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

Together, these cases offer a "refined standard" for us to consider when evaluating dismissals. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). Where a complaint contains allegations that are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). What this means in any given case will depend entirely on the nature of the claims and the context in which they arose. *See Kan. Penn Gaming*, 656 F.3d at 1215 ("The nature and specificity of the allegations required to state a plausible claim will vary based on context."). As the Supreme Court has explained, we must draw upon our "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, though a plaintiff need not meet the outdated and ill-informed requirements of code-pleading, a court must find some plausible claim for a complaint to survive a motion to dismiss. *Id.* at 678–79.

So where does that leave us? In *Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012), we explained that "[w]hile the 12(b)(6) standard does not require that [a plaintiff] establish a prima facie case in her complaint, the elements of each alleged cause of action help to determine whether [she] has set forth a plausible

claim." *Khalik*, 671 F.3d at 1192. Accordingly, to assess whether Dr. Morman's complaint is "plausible" and thus survives the defendants' 12(b)(6) motion to dismiss, "we start by discussing the elements a plaintiff must prove to establish a claim for discrimination." *Id.*

## B.     Dr. Morman's Gender-Discrimination Claim

As a threshold matter, we must determine the nature of Dr. Morman's sole claim—a gender-based equal-protection claim under the Fourteenth Amendment. In short, she supports this claim by contending that CCMH and the individual defendants failed to provide her with the same employment benefits provided to the three PROS male orthopedic surgeons later employed by CCMH. As she did in the district court, Dr. Morman rests her claim not on disparate impact, but on disparate treatment. Disparate treatment is intentional discrimination, while disparate impact involves "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on [the protected class]." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

In her complaint, Dr. Morman alleges that all "conduct was performed knowingly, intentionally and maliciously to deprive Dr. Morman of her rights under the United States Constitution." Appellant's App. vol. 1 at 23. She also claims that "the acts of the individual defendants alleged in this Complaint constituted an official policy or custom of CCMH and/or deliberate indifference on the part of CCMH." *Id.* But, as the district court determined, Dr. Morman's allegation that the defendants acted under a custom or policy is a legal conclusion unsupported by any of her

10

factual allegations. The Supreme Court explained in *Iqbal* that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 556 U.S. at 679. We therefore agree with the district court that we need not accept this allegation as true. She also abandoned the policy argument when she failed to argue it in response to the motion to dismiss, and she does not assert this argument on appeal. Thus, like the district court, we will evaluate her claim within the disparate-treatment framework.

To prove an equal-protection claim based on disparate treatment, a plaintiff must provide either direct evidence of discrimination or prevail under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972).[5] *Khalik*, 671 F.3d at 1192. Under *McDonnell Douglas*, the plaintiff must first prove a prima facie case of discrimination. *Id.* If she does so, then the burden "shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant provides such a reason, "the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id.*

---

[5] "[T]he elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in *McDonnell Douglas*, whether that case is brought under §§ 1981 or 1983 or Title VII." *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991); *see Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995) (stating that a city can be held liable for any impermissible employment decisions under either §§ 1981 or 1983).

11

We must pause here, though, to ask what this means in the procedural posture of this case: a Rule 12(b)(6) motion to dismiss.

In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), the Supreme Court explained that *McDonnell Douglas*'s prima facie case is "an evidentiary standard, not a pleading requirement." *Swierkiewicz*, 534 U.S. at 510. As the Court made clear, the standards for employment discrimination set forth in *McDonnell Douglas* simply do not "apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Still, *Twombly* and *Iqbal* require that a plaintiff allege a plausible claim. Despite what Dr. Morman suggests, we can evaluate her claim's plausibility only by considering the prima facie case of discrimination that she would need to prove in court. In pleading a discrimination claim, she need not set forth a prima facie case for discrimination. But she must allege facts that make such a claim at least plausible.

Thus, to evaluate whether her complaint survives a motion to dismiss, absent direct evidence of discrimination, we examine the first step of the *McDonnell Douglas* framework: the elements Dr. Morman would need to establish to prove a prima-facie case of gender discrimination. *See Khalik*, 671 F.3d at 1192. That is the only way to assess if her claim is, in fact, plausible. Dr. Morman must have pleaded a plausible claim of gender discrimination to survive dismissal. The inferences offered by the *McDonnell Douglas* framework assist judges in resolving motions to dismiss by providing an analytical framework to sift through the facts alleged. *Messina v. Kroblin Transp. Sys., Inc.*, 903 F.2d 1306, 1308 (10th Cir. 1990). Although the

burden-shifting framework is only an evidentiary standard, we must recognize that "the *McDonnell Douglas* framework should not be applied in a manner that renders it nothing more than an empty pleading formula, allowing every allegation of employer discrimination to get to a jury." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1173 (10th Cir. 2007); *see id.* (evaluating the standard in the context of a motion for summary judgment).

What Dr. Morman needed to plead to state a plausible claim of discrimination depends on the nature of the claim she filed. Here, Dr. Morman's sole claim is premised on the Equal Protection Clause, which requires that no state "deny to any person within its jurisdiction equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional guarantee "prohibits state and local governments from treating similarly situated persons differently." *Rector v. City & Cty. of Denver*, 348 F.3d 935, 949 (10th Cir. 2003). The fundamental guarantee is that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S 432, 439 (1985).

The prima-facie case required to support a claim of intentional discrimination under the Equal Protection Clause varies based on the context and nature of the facts. Indeed, "[t]he Supreme Court recognized in *McDonnell Douglas* that the articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citing *McDonnell Douglas*, 411 U.S. at 802 n.13); *see Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) (explaining that

13

*McDonnell Douglas* created a flexible standard for plaintiffs to show a prima facie case of discrimination that may be modified to fit the facts of a case). "[T]he *McDonnell Douglas* burden-shifting framework applies to equal-protection claims in the employment context." *Ney v. City of Hoisington*, 264 F. App'x 678, 684 (10th Cir. 2008) (unpublished).

Because there are varying standards based on the particular facts of any given discrimination case, the parties dispute which elements should apply here.[6] But we need not decide the specific elements Dr. Morman would need to prove to succeed at trial. Under any standard, to prevail on an equal-protection claim, she would need to show that she was treated differently than similarly situated employees—in other words, she needed to be similarly situated to the male orthopedic surgeons. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (explaining that a plaintiff must show that she was "intentionally treated differently from others similarly situated"). In any employment-discrimination case, the ultimate issue and "central focus of the inquiry . . . is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin."

---

[6] On the one hand, in her response to the motion to dismiss, Dr. Morman urged the court to apply the standard from *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790 (10th Cir. 2007): "[A] prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *PVNF*, 487 F.3d at 800. On the other hand, the defendants turn to *Orr v. City of Albuquerque*, 417 F.3d 1144 (10th Cir. 2005), which required a plaintiff to prove "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Orr*, 417 F.3d at 1149. The district court applied the latter.

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (internal quotation marks omitted). Thus, to survive the motion to dismiss, Dr. Morman needed to plead a plausible claim that she was similarly situated to the male orthopedic surgeons. That she has failed to do.

Accepting all of Dr. Morman's allegations as true, we readily can see that she hasn't pleaded a plausible claim that she was similarly situated to the PROS surgeons "in all *material* respects." *Kan. Penn Gaming*, 656 F.3d at 1217 (emphasis added). Gender alone is insufficient without considering other factors, such as the contrasting circumstances in which Dr. Morman and the PROS surgeons became CCMH employees.

In September 2009, CCMH employed Dr. Morman after she returned from her Massachusetts fellowship. In May 2012, by contrast, CCMH hired the PROS surgeons as part of CCMH's multi-million-dollar purchase of their ongoing practice, building, and equipment. Thus, CCMH hired Dr. Morman as a qualified surgeon who just had returned to Gillette, but hired the PROS surgeons as part of a multi-million-dollar transaction in which they sold their established orthopedic surgery and radiology practices to CCMH.

Simply put, *the facts Dr. Morman alleged in her complaint* show her dissimilarity from the PROS surgeons. She did not offer anything approaching the level of assets, staff, building, patient base, equipment, or years of building a local and regional reputation as had the PROS surgeons. Her education and skill cannot justify a legal rule requiring that, before acquiring PROS and hiring its owners,

15

CCMH must elevate Dr. Morman's employment conditions to those offered to the PROS surgeons. Nor can it justify a rule requiring that it must condition its purchase of PROS upon its three surgeons receiving the same pay and employment conditions as it had hired Dr. Morman. Simply put, the Equal Protection Clause provides no such relief here.

Dr. Morman incorrectly contends that the district court engaged in impermissible fact-finding in dismissing her claim. In fact, the district court did no more than faithfully accept her factual allegations as true and evaluate those facts within the disparate-treatment framework. It examined the consideration paid for the PROS practice, the negotiated management agreement, and the services that the PROS surgeons provided. When it looked at these facts alleged in her complaint, the district court concluded—and we agree—that the PROS surgeons "brought many things to the bargaining table when they were hired that [Dr. Morman] simply did not." Appellant's App. vol. 3 at 347. As the district court explained, all of the issues that form the bases of Dr. Morman's claim—the clinic name; employee hiring, staffing, and management; the office space; radiology services; and marketing campaigns—"are things [the PROS surgeons] brought to the table when they entered into the agreements with CCMH three years after [Dr. Morman] was hired." *Id.*

As Dr. Morman acknowledges, to prevail she must plausibly allege that the differential treatment is "on account of being a member of a protected class." Appellant's Opening Br. 37. The Fourteenth Amendment provides "equal laws," but it does not guarantee "equal results." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256,

16

273 (1979). Here, given the difference in what Dr. Morman and the PROS physicians brought to CCMH, Dr. Morman has not pleaded a plausible claim for gender discrimination. Her facts, accepted as true, show only that the hospital's negotiations with different parties resulted in different outcomes—the PROS surgeons had far more to offer CCMH when they negotiated their terms of employment. Because Dr. Morman has failed to allege a plausible claim that she was treated differently than similarly situated employees, we hold that the district court properly dismissed her discrimination claim.

## C.    Qualified Immunity

Dr. Morman also argues that the district court improperly held that CCMH's board members and Morasko were entitled to qualified immunity in their individual capacities. We disagree.

We review de novo a district court's decision to grant qualified immunity. *Harman v. Pollock*, 446 F.3d 1069, 1077 (10th Cir. 2006). We evaluate a Rule 12(b)(6) dismissal based on qualified immunity under a two-part test that asks: (1) whether the plaintiff's constitutional right was violated, and (2) whether that right was clearly established at the time it was violated. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Under *Pearson*, we have discretion to address either prong first "in light of the circumstances in the particular case at hand." *Id.* at 236. In this case, we begin—and end—with the second prong.

For a right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other

17

courts must have found the law to be as the plaintiff maintains." *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (internal quotation marks omitted). We acknowledge that "[t]he plaintiff is not required to show, however, that the very act in question previously was held unlawful . . . to establish an absence of qualified immunity." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (internal quotation marks omitted). Defendants must make "reasonable applications of the prevailing law to their own circumstances." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (internal quotation marks omitted).

Here, Dr. Morman contends that she has identified clearly established law supporting her view that CCMH and the individual defendants violated her equal-protection rights by employing the PROS male surgeons on terms more favorable than those she agreed to for herself. Broadly she asserts that any public official would know that gender discrimination is unlawful. She argues that "precedent from both the Supreme Court and this Court should have made it clear to any person in the defendants' position that it would have been unlawful to treat Dr. Morman differently from her male colleagues in the manner described in the Complaint based on her [gender]." Appellant's Opening Br. 54–55.

Despite her argument that the law was clearly established, Dr. Morman fails to meet her burden. She references "precedent from both the Supreme Court and this Court," but fails to offer anything more than general principles of law to support her claim. *Id.* at 54. The issue here is not whether Dr. Morman had a right to be free from gender discrimination in the workplace—there is no dispute about that. Instead, the

18

question is whether clearly established law required CCMH to employ the PROS surgeons on the same terms as Dr. Morman when entering a multi-million dollar acquisition of their longtime local and regional practice, building, and equipment. Dr. Morman would have to plausibly allege that the defendants as reasonable officials would understand that their actions would violate her equal-protection rights. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Here, Dr. Morman has not cited a single case that would support her position that the law demands equal results when an employer negotiates an employment contract with differently situated employees. Instead, she merely cites *Feeney*, 442 U.S. at 273, and *City of Cleburne*, 472 U.S. at 439, for general principles of equal-protection jurisprudence. Because Dr. Morman offers nothing more than "a broad general proposition," *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), we conclude that Dr. Morman failed to show that the individual defendants violated clearly established law. Thus, we hold that qualified immunity protects the defendant board members and Morasko from suit and liability in their individual capacities. We therefore affirm the district court.

### III. CONCLUSION

Because Dr. Morman failed to state a plausible claim for relief and qualified immunity shields the defendant board members and Morasko from liability in their

individual capacities, we affirm the district court on all grounds.

Entered for the Court


Gregory A. Phillips
Circuit Judge