FILED
United States Court of Appeals
Tenth Circuit

September 10, 2024

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

COREY MCNELLIS,

    Plaintiff - Appellant,

v.

DOUGLAS COUNTY SCHOOL
DISTRICT,

    Defendant - Appellee.

No. 23-1306

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:22-CV-01636-RM-STV)**

_____

Spencer J. Kontnik, Kontnik | Cohen, LLC, Denver, Colorado, for Plaintiff-Appellant.

Jonathan P. Fero (Michael Brent Case with him on the brief), Semple, Farrington, Everall & Case, P.C., Denver, Colorado, for Defendant-Appellee.

_____

Before **HARTZ**, **BACHARACH**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

    Plaintiff Corey McNellis is a former Athletic Director and Assistant

Principal of a high school within Defendant Douglas County School District

(DCSD). In a staff email chain, he expressed reservations about an extracurricular activity at the school—an upcoming performance of *The Laramie Project*—and offered to add a "Christian perspective" to the theatrical production. Shortly thereafter, he was placed on administrative leave, investigated, and ultimately terminated.

Mr. McNellis sued DCSD in federal district court in Colorado. In his complaint,[1] Mr. McNellis brought a First Amendment retaliation claim under 42 U.S.C. § 1983 and religious discrimination and retaliation claims under Title VII and Colorado law. The district court dismissed the case under Federal Rule of Civil Procedure 12(b)(6). Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the dismissal of Mr. McNellis's discrimination claims under Title VII and the Colorado Anti-Discrimination Act (CADA) and remand for further proceedings. We otherwise affirm.

## I

### A

Mr. McNellis worked for fourteen years at Ponderosa High School in Douglas County.[2] At the time of the events alleged in Mr. McNellis's

---

[1] By "complaint," we refer to the operative first amended complaint.

[2] Because the appeal before us concerns a motion to dismiss, we take the facts from Mr. McNellis's complaint.

complaint, he served as the Athletic Director and Assistant Principal. Mr. McNellis was also the father of a Ponderosa High School student. "Throughout his employment with DCSD," Mr. McNellis alleged, "[he] had consistently received excellent performance reviews," and, before the events underlying this lawsuit, had "never received disciplinary action." App. at 94 ¶¶ 45–46.

Mr. McNellis was a member of the school's Administrative Team, along with the school principal, Mr. Ottmann, and other assistant principals. The Administrative Team met "once a week to discuss any issues that may arise with respect to extracurricular activities." App. at 94 ¶ 42. They did not, however, "debate, discuss, or otherwise address the issues under their purview in a public forum or with the entire staff at Ponderosa." App. at 94 ¶ 43. Nor was the Administrative Team "responsible for determining the content of the school plays that were produced by the theatre department." App. at 94 ¶ 44.

On October 2, 2020, the school theatre director, Kayla Diaz, emailed the entire staff at Ponderosa High School, including Mr. McNellis, about an upcoming school play. The email said the school's theatre department would perform *The Laramie Project* later that month. *The Laramie Project* "depicts the aftermath of the 1998 murder of Matthew Shepard in Laramie, Wyoming," which "is widely acknowledged to have been a hate crime

motivated by Shepherd's sexuality." App. at 95 ¶ 54. In her email, Ms. Diaz

wrote,

> [O]ur new Technical Theatre teacher . . . and I selected The Laramie Project for our first production of the year . . . . We predicted that our students would want to learn about this story and participate in meaningful dialogue during a time when they may feel stuck and powerless [due to the COVID-19 pandemic]. . . .
>
> I am very proud of the maturity and responsibility these students have taken on to learn about the history of this event and to bring the story of Laramie into our theater. I know that your support means a lot to them. . . .
>
> Due to the language and the content discussed in the show (there is no violence shown, only discussed) this is not a family-friendly show. We are advertising "For mature audiences" and I would generally recommend high school age and up. We will be reaching out more soon about advertising in the school, but it is important that I can answer any questions you may have and that you are aware of the nature of the play so that if we have students who have an aggressively adverse reaction to our show choice that you can support us in helping students understand. This is a play about perspectives, and we would not want anyone in the school to believe that we are making a statement against anything other than hate and violence.

App. at 137–38.[3] Mr. McNellis responded in an email,

---

[3] Mr. McNellis described the staff email chain and several of the individual emails in his complaint. But he did not quote the full email chain or attach a copy of it to his complaint. "Generally, the sufficiency of a complaint [under Rule 12(b)(6)] must rest on its contents alone." *Gee* v. *Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). If a district court looks outside the contents of the complaint, "it must convert the Rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties." *Id.* "But there are exceptions to this rule." *Toone* v. *Wells Fargo*

> Thanks Kayla, I appreciate the email and I really do admire the hard work that you do. As a Dad of a student here and also as an employee in the school, what is my recourse if I disagree with the production? Was this a heads up to see if everyone is cool?

App. at 138. Several other teachers joined the email conversation. One teacher thought the show "closely connects to Ponderosa High School's core values of kindness, empathy, and respect." App. at 138. Another added "[a]s a history teacher I'm glad to hear that our students are engaging with important historical events across subject areas," while a social studies teacher explained the play "pushes students to think critically about our society." App. at 139. Another teacher wrote, "I've used [the play] in conjunction with 'To Kill a Mockingbird'; it is powerful, thought provoking, and reflective." App. at 142. And one teacher expressed support for

---

*Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013); *see also Gee*, 627 F.3d at 1186. "Courts are permitted to review 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Toone*, 716 F.3d at 521 (quoting *Gee*, 627 F.3d at 1186).

Here, DCSD attached a copy of the email chain to its motion to dismiss. The district court reasoned the contents of that exchange were central to Mr. McNellis's claims and undisputed by the parties. The district court found it "may consider the email exchange . . . without converting the Motion into a motion for summary judgment." App. at 193 n.1. On appeal, the parties do not challenge the district court's reliance on the full text of the email chain. In considering this appeal, we likewise rely on the undisputed full text of the email exchange attached to DCSD's motion to dismiss. *See Toone*, 716 F.3d at 521 ("[W]e examine the document itself, rather than the complaint's description of it.").

"expos[ing] our students to the wide variety of perspectives that we all have," because "[n]ot everyone has to agree with every ideology that exists, but it is the discourse that is invoked that matters." App. at 140.

Mr. McNellis sent three more emails as part of this conversation.

- "As a [C]hristian I would love to collaborate with your project. Please let me know if the love that Jesus can provide will help your play," App. at 140;

- "For the record, all of administration does not agree with me on this. I am totally solo. Good night Mustangs!" App. at 141; and

- "I understand people support this. Forgive me for having a different viewpoint and the audacity to publicly share it," App. at 143.

The email chain about *The Laramie Project* was then shared with Mr. Ottmann, DCSD's Human Resources Director, Cathy Franklin, and the Director of Schools, Daniel Winsor.

The next day, Mr. Winsor "called Mr. McNellis and informed him that [he] needed to stay home on Monday . . . . because of his 'religious comments.'" App. at 97 ¶¶ 67, 70. Mr. Winsor told Mr. McNellis "nothing was unprofessional" and "he did not need to worry." App. at 97 ¶¶ 70, 72. Mr. McNellis believed he was being treated differently based on his "religious comments" about *The Laramie Project*. App. at 97 ¶ 71.

A few days later, on October 5, 2020, Ms. Franklin, Mr. Winsor, and Mr. Ottmann met with Mr. McNellis. They explained to Mr. McNellis that

6

DCSD was investigating him for his "religious comments," App. at 98 ¶ 80, and he would be placed on administrative leave during the investigation. Mr. McNellis "objected to Defendant's conduct during the [m]eeting because he did not feel comfortable with the way the meeting went." App. at 98 ¶ 83. While on leave, Mr. McNellis "complained to Principal Ottmann" and "several co-workers" that he was being investigated "based on his Christian beliefs." App. at 100 ¶¶ 95–96.

During DCSD's investigation, it "received a complaint from a teacher claiming that Mr. McNellis was part of a good ole boys club," along with other male teachers and administrators. App. at 100 ¶ 101. Unlike Mr. McNellis, those other staff members were not investigated, placed on leave, or disciplined. The investigation also uncovered "a single email indicating that Mr. McNellis had complained 'as a parent' about [the school's] communications regarding its COVID safety protocols." App. at 101 ¶ 106. On October 29, 2020, at the end of the investigation, DCSD terminated Mr. McNellis's employment. According to Mr. McNellis, "Defendant directly cited Mr. McNellis' emails regarding The Laramie Project as the reason for his termination." App. at 101 ¶ 114.

On July 1, 2022—nearly two years after Mr. McNellis's termination—Mr. Ottmann wrote a letter addressed "To Whom It May Concern . . . on

behalf of Corey McNellis, a lifelong friend and colleague."[4] App. at 145.

Mr. Ottmann stated he "didn't feel comfortable" writing this letter while

still employed by DCSD, but since he had just retired, he was "finally able

to give [his] perspective on what happened to [Mr. McNellis]." App. at 145.

Mr. Ottmann wrote,

> In October 2020, [Mr. McNellis] responded to an email from our theater teacher regarding the play "The Laramie Project[."] He was concerned about the negative portrayal of Christians within the play and asked to have a conversation with our theater teacher. Unfortunately, certain people within the building felt like his email was inappropriate and contacted Human Resources. The contents of the email w[ere] eventually the catalyst for his firing, which I thought went too far. I felt like a "Letter of Reprimand" would have been appropriate, along with a conversation and perhaps an apology. I later learned that a specific group of people "piled on" the complaints about [Mr. McNellis], which played into the decision to ultimately terminate him as a DCSD employee."
>
> I truly believe that [Mr. McNellis] was "railroaded" by the specific group of people based on his political and religious views. In my opinion, his firing was unjust and unfair, and unfortunately, even though I was the principal, I couldn't save him because it wasn't my decision to make.

---

[4] The complaint does not specify to whom Mr. Ottmann sent the letter. In its motion to dismiss, DCSD explained Mr. Ottmann "wrote [the] letter to the District." App. at 117. Mr. McNellis does not claim otherwise.

App. at 145–46.[5] That same day, Mr. McNellis sued DCSD in federal district court.

Mr. McNellis asserted these claims: (1) free speech retaliation under 42 U.S.C. § 1983; (2) discrimination in violation of Title VII and CADA; and (3) retaliation in violation of Title VII and CADA. DCSD moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, concluding Mr. McNellis stated no plausible claims. This timely appeal followed.

## II

Mr. McNellis contends the district court erroneously dismissed his lawsuit. "We review de novo the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief can be granted." *Reznik* v. *inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (citing *Khalik* v. *United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012)). In evaluating a motion to dismiss, "the court must take as true '[a]ll

---

[5] As with the staff email chain, Mr. McNellis referred to Mr. Ottmann's letter in his complaint but did not quote the letter in full or attach a copy of it to his complaint. DCSD, however, attached a copy of the letter to its motion to dismiss. The district court considered the full contents of the letter in ruling on the motion to dismiss, acknowledging "[t]he letter is referred to in the Complaint" and the parties do not dispute its authenticity. App. at 203 n.2 (citing *Toone*, 716 F.3d at 521). We do the same and for the same reasons. *See Gee*, 627 F.3d at 1186.

well-pleaded facts, as distinguished from conclusory allegations,' view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings." *Id.* (alteration in original) (quoting *Ruiz* v. *McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002)). "Still, [a] complaint cannot rely on labels or conclusory allegations—a 'formulaic recitation of the elements of a cause of action will not do.'" *Greer* v. *Moon*, 83 F.4th 1283, 1292 (10th Cir. 2023), *cert. denied*, No. 23-958, 2024 WL 2116298 (U.S. May 13, 2024) (quoting *Bell Atl. Corp.* v. *Twombly,* 550 U.S. 544, 555 (2007)); *Matney* v. *Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023) ("A conclusory allegation is one in which an inference is asserted without stating underlying facts or including any factual enhancement." (internal quotation marks omitted)). Rather, "[t]o withstand a motion to dismiss, a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Reznik*, 18 F.4th at 1260 (quoting *Twombly*, 550 U.S. at 570).

We consider each of Mr. McNellis's claims in turn. Ultimately, we affirm the dismissal of Mr. McNellis's free speech retaliation claim brought under 42 U.S.C. § 1983 and retaliation claims brought under Title VII and CADA. But we conclude Mr. McNellis stated a plausible discrimination claim under Title VII and CADA, so we reverse the district court's contrary ruling.

10

## A

Mr. McNellis alleged his emails about *The Laramie Project* were an exercise of "his right to free speech under the First Amendment to the U.S. Constitution." App. at 107 ¶ 154. According to Mr. McNellis, DCSD retaliated against him for exercising his First Amendment free speech rights by placing him on administrative leave and ultimately terminating his employment. Mr. McNellis sought relief for this alleged retaliation under 42 U.S.C. § 1983. *See id.* (providing "[e]very person who, under color of [the law] . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law"); *see also, e.g., Pryor* v. *Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024) ("Plaintiff claims Defendants—acting under color of law—retaliated against him for speech that the First Amendment protects, violating his constitutional rights.").

## 1

"The elements of a First Amendment retaliation claim differ depending on whether the speaker is employed by the alleged retaliator." *Pryor*, 99 F.4th at 1250. The parties agree that as an employee of DCSD—a public school district—Mr. McNellis is a "public employee." *See Bailey* v. *Ind. Sch. Dist. No. 69 of Canadian Cnty. Okla.*, 896 F.3d 1176, 1179 (10th

Cir. 2018) (describing employee of a public school district as a "public employee").

In the case of public employees, there is "inherent tension between an employee's right to free speech and the government employer's right to exercise 'a significant degree of control over their employees' words and actions.'" *Rohrbough* v. *Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010) (quoting *Garcetti* v. *Ceballos*, 547 U.S. 410, 418 (2006)). "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Brammer-Hoelter* v. *Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 418). "At the same time, the [Supreme] Court has recognized that a citizen who works for the government is nonetheless a citizen." *Garcetti*, 547 U.S. at 419. Thus, "[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Id.*

When, as here, a public employee brings a free speech retaliation claim against his employer, we apply the "familiar five-part *Garcetti/Pickering* test." *Duda* v. *Elder*, 7 F.4th 899, 910 (10th Cir. 2021). That test, derived from *Garcetti* v. *Ceballos*, 547 U.S. 410 (2006) and *Pickering* v. *Board of Education*, 391 U.S. 563 (1968), looks to whether

12

(1) the speech was made pursuant to the employee's official duties, (2) the speech was on a matter of public concern, (3) the government's interests as an employer in promoting efficient public service outweigh a plaintiff's free speech interests, (4) the speech was a motivating factor in the adverse employment action, and (5) the same employment decision would have been made without the protected speech.

*Roberts* v. *Winder*, 16 F.4th 1367, 1381 (10th Cir. 2021). "The test balances 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Duda*, 7 F.4th at 910–11 (alteration in original) (quoting *Pickering*, 391 U.S. at 568). These five factors are "essential elements" of a First Amendment retaliation claim brought by public employees under § 1983. *Tufaro* v. *Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 107 F.4th 1121, 1138 (10th Cir. 2024). "The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact." *Brammer-Hoelter*, 492 F.3d at 1203. "To prevail, a plaintiff must show all five elements."[6] *Duda*, 7 F.4th at 911.

---

[6] Of course, at the Rule 12(b)(6) stage, "show" means plausibly allege, not conclusively prove. But the failure to plausibly allege any one of the *Garcetti/Pickering* elements is fatal. *See Morris* v. *City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) (affirming dismissal of First Amendment retaliation claim where plaintiff failed to plausibly allege the second element); *Lincoln* v. *Maketa*, 880 F.3d 533, 539 (10th Cir. 2018) (finding, at 12(b)(6) stage, alleged retaliation would not have violated a clearly

**2**

The district court concluded Mr. McNellis failed to plausibly allege the first, second, and fourth elements of the *Garcetti/Pickering* test.[7] As to the first element, the district court found Mr. McNellis's emails about *The Laramie Project* "were made pursuant to his official duties." App. at 198. And "Plaintiff's professed disagreement with the play," the district court reasoned, "is a matter of personal, rather than public concern." App. at 200. As to the fourth element, the district court found the complaint "lacks factual allegations that would establish that Plaintiff's emails were a motivating factor in his firing." App. at 200.

On appeal, Mr. McNellis urges reversal, contending his speech was not made pursuant to his official duties and involved a matter of public concern. Mr. McNellis also maintains he sufficiently alleged his emails were

---

established constitutional right where one plaintiff arguably did not plausibly allege the first element and another plaintiff arguably did not plausibly allege the fourth element).

[7] Because we conclude Mr. McNellis has failed to plausibly allege his speech was made in his capacity as a private citizen, we do not reach the parties' arguments about the remaining elements of the *Garcetti/Pickering* test. *See Brammer-Hoelter* v. *Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) ("If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" (quoting *Garcetti* v. *Ceballos*, 547 U.S. 410, 422 (2006))).

a motivating factor in DCSD's decision to terminate him. We discern no error in the district court's decision to dismiss Mr. McNellis's First Amendment retaliation claim. Mr. McNellis falters at the first step of the *Garcetti/Pickering* test: he has not plausibly alleged that, in his emails with school staff about *The Laramie Project*, he was speaking as a private citizen and not as an employee of DCSD.

Our precedents "have taken a broad view of the meaning of speech that is 'pursuant' to an employee's 'official duties.'" *Thomas* v. *City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) (internal quotation marks omitted). "These decisions, however, have not developed a set of bright line rules to determine when an employee speaks pursuant to her official duties for the purposes of *Garcetti/Pickering*." *Rohrbough*, 596 F.3d at 746. Rather, we use "a case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Id.*

"Merely because an employee's speech was made *at* work and *about* work does not necessarily remove that employee's speech from the ambit of constitutional protection." *Thomas*, 548 F.3d at 1323. Instead, "speech is made pursuant to official duties if it is generally consistent with 'the type of activities [the employee] was paid to do.'" *Brammer-Hoelter*, 492 F.3d at 1203 (alteration in original) (quoting *Green* v. *Bd. of Cnty. Comm'rs*,

15

472 F.3d 794, 801 (10th Cir. 2007)). "[I]f an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *Id.* "The ultimate question is whether the employee speaks as a citizen or instead as a government employee—an individual acting 'in his or her professional capacity.'" *Id.* (quoting *Garcetti*, 547 U.S. at 422).

DCSD contends Mr. McNellis's speech about *The Laramie Project* "was made as part of his assigned responsibilities" and to "perform[] a task he was paid to do." Resp. Br. at 10. We agree.

Recall, Mr. McNellis alleged his duties as a member of the Administrative Team included "meet[ing] once a week to discuss *any issues that may arise* with respect to extracurricular activities." App. at 94 ¶ 42 (emphasis added). As DCSD persuasively argues, Mr. McNellis's "email responses to Ponderosa staff regarding *The Laramie Project* fall squarely within that duty." Resp. Br. at 11. Ms. Diaz contacted school staff about the upcoming performance of *The Laramie Project* so she could "answer any questions [staff] may have" and make staff "aware of the nature of the play so that if we have students who have an aggressively adverse reaction to our show choice that you can support us in helping students understand." App. at 138. And the email thread garnered several staff responses bearing

16

on the relationship between the school's production of *The Laramie Project* and school policies and subjects. *See* App. at 138–43 (emails describing the play's consistency with the school's "core values" and "anti-bullying program"; offering to assist by providing a "Social Studies perspective" to the play's "engag[ement] with important historical events across subject areas"; and explaining teachers have "used [*The Laramie Project*] in conjunction with 'To Kill a Mockingbird'"). Mr. McNellis was, as DCSD points out, "directly responding to" an email conversation about issues arising out of the extracurricular performance. Resp. Br. at 12.

The question remains whether Mr. McNellis's speech was made "during the course of performing an official duty." *Brammer-Hoelter*, 492 F.3d at 1203. Considering the substance of his emails, we conclude the answer is yes. Mr. McNellis replied to Ms. Diaz's email, asking "[a]s a Dad of a student here *and also as an employee in the school*, what is my recourse if I disagree with the production?" and stating he wished to "collaborate" so "the love that Jesus can provide will help your play." App. at 138, 140 (emphasis added). In other words, Mr. McNellis, *pursuant to his official duties*, raised concerns about an extracurricular activity at the school—

17

precisely the sort of thing he was paid to do.[8] *See Brammer-Hoelter*, 492 F.3d at 1203. ("[I]f an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties."). We therefore have no trouble concluding Mr. McNellis was speaking not as an ordinary citizen but "in his . . . professional capacity." *Garcetti*, 547 U.S. at 422.

Our conclusion is bolstered by looking at who was on the receiving end of Mr. McNellis's emails. "Regarding the employee's chosen audience, or chosen method of disseminating speech, the court has . . . refrained from establishing per se rules for determining whether speech is made pursuant to an employee's official duties." *Rohrbough*, 596 F.3d at 747. But we have

---

[8] DCSD appears also to contend Mr. McNellis's speech was made pursuant to his official duties, relying on a list of employee responsibilities found in a DCSD personnel document. *See* Resp. Br. at 11 (describing Mr. McNellis's job duties as including "coordinating effective communication strategies among students, community members and staff"); App. at 135 (listing employee's responsibility to "[c]oordinate effective communications strategies among the students, the community, the faculty, and the administration"). This personnel document, as Mr. McNellis correctly points out, was attached as an exhibit to DCSD's motion to dismiss. The exhibit was not incorporated by reference into Mr. McNellis's complaint, and DCSD has not identified any basis under which we could consider it. *See Gee*, 627 F.3d at 1186 (listing exceptions to the general rule that "the sufficiency of a complaint must rest on its contents alone"). The district court did not consider the exhibit, and neither do we.

"observed that speech directed at an individual or entity outside of an employee's chain of command is often outside of an employee's official duties," while "speech directed . . . within an employee's chain of command is often found to be pursuant to that employee's official duties." *Id.* (citing cases).

As DCSD points out, "McNellis's responses to Diaz's email were . . . in an internal email thread that only included Ponderosa staff." Resp. Br. at 12. While not dispositive, the staff-only nature of the email exchange further suggests Mr. McNellis was speaking pursuant to his official duties. *See Knopf* v. *Williams*, 884 F.3d 939, 945 (10th Cir. 2018) (describing "the recipient of the employee's speech" as "relevant" to the first *Garcetti/Pickering* element but not dispositive on its own). The circumstances before us are distinguishable from those in which an employee was speaking as a private citizen. *See, e.g.*, *Pryor*, 99 F.4th at 1251 (finding the first *Garcetti/Pickering* prong "weighs in Plaintiff's favor" where "Plaintiff voiced criticism through his personal Facebook page, independent news outlets, and at public comment sessions—all forums citizens often use for civic discourse"); *Brammer-Hoelter*, 492 F.3d at 1205 (finding some of the speech at issue "pass[ed] the first step of the *Garcetti/Pickering* analysis" in part because "the discussions included ordinary citizens and parents who were not employed by the [defendant]").

19

Accordingly, we agree with the district court that Mr. McNellis "has not alleged facts that would satisfy the first prong of the *Garcetti/Pickering* test." App. at 199.

**3**

Mr. McNellis unsuccessfully attempts to resist this conclusion.

First, Mr. McNellis contends he was asking "about his recourse as a 'Dad of a student' if he disagreed with the production," so he was speaking purely as a citizen. Opening Br. at 10. Mr. McNellis was "merely commenting on the play as a father and a Christian," he insists, "which is his prerogative as a parent and not part of his responsibilities as an employee." Opening Br. at 12. We are not persuaded.

Mr. McNellis's decision to marshal his status as a parent when participating in the staff email exchange is not insignificant. But Mr. McNellis cites no authority suggesting his reference to being a "Dad of a student" is necessarily dispositive of the first prong of the *Garcetti/Pickering* test—particularly when he said he was also speaking "as an employee in the school." *See* App. at 138. The First Amendment inquiry requires "a case-by-case approach," *Rohrbough*, 596 F.3d at 746, and here, when considering the substance and context of his speech in the totality, Mr. McNellis's self-identification as a parent does not change our conclusion that he was speaking pursuant to his official duties as a DCSD employee.

20

As the district court properly explained, there is no indication "Plaintiff's reference to his parental status suffices to establish that he was speaking as a private citizen rather than a public employee" when he spoke from his staff email address, to a staff-only audience, referencing his role as a staff member.[9] App. at 198.

Second, Mr. McNellis contends "to the extent there was any ambiguity about the nature of his speech, McNellis followed up and explained that he was acting alone." Opening Br. at 10. In support, Mr. McNellis directs us to his email stating "[f]or the record, all of administration does not agree with me on this. I am totally solo." Opening Br. at 10 (alteration in original) (quoting App. at 141). This email, Mr. McNellis insists, indicates he was speaking in his capacity as a private citizen. We disagree. At most, this statement means precisely what it says: his colleagues on the Administrative Team did not agree with Mr. McNellis on this matter.[10]

---

[9] Mr. McNellis notes "other staff commented on the play in their capacity as parents." Opening Br. at 12. But he does not explain how—if at all—this fact changes the analysis, particularly when Mr. McNellis was speaking pursuant to his official duties when he discussed potential issues surrounding the school's performance of *The Laramie Project* in a staff email exchange.

[10] Relatedly, Mr. McNellis faults the district court's interpretation of his "I am totally solo" email. In considering this email, the district court explained "it could reasonably be interpreted to mean that he was speaking as an administrator, albeit one without the full backing of the

Finally, Mr. McNellis next contends the "well-pled facts . . . establish that [his] responsibilities did not include commenting on or selecting the play." Opening Br. at 11. In support, he directs us to two allegations: (1) "[t]he Administrative Team was not responsible for determining the content of the school plays that were produced by the theatre department"; and (2) "the 'Administrative Team would not debate, discuss, or otherwise address the issues under their purview in a public forum or with the entire staff at Ponderosa.'" Opening Br. at 9 (alteration in original) (quoting App. at 94 ¶¶ 43–44).

Mr. McNellis's argument misunderstands the law. "An employee's official job description is not dispositive" of the question before us: "whether the employee speaks 'pursuant to [his] official duties.'" *Brammer-Hoelter*, 492 F.3d at 1203 (alteration in original) (quoting *Garcetti*, 547 U.S. at 421). Indeed, "speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Id.* We must ask whether the speech is "generally consistent with

Administrative Team." App. at 198. Mr. McNellis says the district court reversibly erred because it construed the email in favor of DCSD. It is true that in reviewing an order on a motion to dismiss, we "view all reasonable inferences in favor of the nonmoving party[] and liberally construe the pleadings." *Reznik* v. *inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021). But applying this standard, no reasonable inference can be drawn in Mr. McNellis's favor, as we have already explained.

22

'the type of activities [the employee] was paid to do.'" *Id.* (alteration in original) (quoting *Green*, 472 F.3d at 801). Here, as we have explained, Mr. McNellis's emails about *The Laramie Project* aligned with his duty to "discuss any issues that may arise with respect to extracurricular activities" in the Administrative Team's weekly meetings. App. at 94 ¶ 42; *see also Brammer-Hoelter*, 492 F.3d at 1203 (acknowledging speech may be made under an employee's official duties "even though the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions").[11]

On *de novo* review, we cannot conclude Mr. McNellis spoke "as a citizen" rather than a "government employee" when sending his emails to DCSD staff about *The Laramie Project*. *See Brammer-Hoelter*, 492 F.3d at 1203; *see Thomas*, 548 F.3d at 1323 ("[E]mployee speech that is made

---

[11] For the first time in his reply brief, Mr. McNellis also insists reversal is required because "the speech occurred after-hours," the email recipients were "outside of McNellis' chain of command," and the emails "did not invoke his authority as an administrator." Reply Br. at 3. "It is our general rule . . . that arguments and issues presented at such a late stage are waived." *Hill* v. *Kemp*, 478 F.3d 1236, 1250 (10th Cir. 2007); *see also Bronson* v. *Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised . . . in an appellant's opening brief."). We will not address these belated contentions. In any event, we note, as the district court did, "[e]mployees commonly read and send work-related emails outside of work hours," App. at 199, and Mr. McNellis's email signature identified himself as "Athletic Director/Assistant Principal," App. at 138, 140–41.

'pursuant' to the employee's professional duties is not accorded First Amendment protection under *Garcetti*."). We affirm the dismissal of Mr. McNellis's free speech retaliation claim.

**B**

We turn now to Mr. McNellis's discrimination claims under Title VII and CADA.

"Title VII makes it unlawful 'to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . .'" *Khalik*, 671 F.3d at 1192 (quoting 42 U.S.C. § 2000e-2(a)(1)). Similarly, CADA forbids employers from "discharg[ing] . . . any individual otherwise qualified because of . . . religion." Colo. Rev. Stat. § 24-34-402. "Colorado and federal law apply the same standards to discrimination claims." *Johnson* v. *Weld Cnty., Colo.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010).

"A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp.* v. *Green*." *Khalik*, 671 F.3d at 1192 (citing 411 U.S. 792 (1973)). We briefly describe these two paths, then explain their application to the procedural posture of a motion to dismiss under Rule 12(b)(6).

"Direct evidence is '[e]vidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.'" *Shorter* v. *ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999) (alterations in original) (quoting Black's Law Dictionary 460 (6th ed. 1990)), *overruled on other grounds by Desert Palace, Inc.* v. *Costa*, 539 U.S. 90 (2003). For example, "[s]tatements showing 'an existing policy which itself constitutes discrimination' are direct evidence of discrimination." *Heim* v. *Utah*, 8 F.3d 1541, 1546 (10th Cir. 1993) (quoting *Ramsey* v. *City & Cnty. of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990), *cert denied*, 506 U.S. 907 (1992)). Statements that "require the trier of fact to infer that discrimination was a motivating cause of an employment decision," however, "are at most circumstantial evidence of discriminatory intent." *EEOC* v. *Wiltel, Inc.*, 81 F.3d 1508, 1514 (10th Cir. 1996). "Usually, . . . a plaintiff will not have direct evidence of discrimination and will establish her claims through circumstantial evidence." *Sanders* v. *Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008).

By contrast, "[u]nder *McDonnell Douglas*, a three-step analysis requires the plaintiff first prove a prima facie case of discrimination." *Khalik*, 671 F.3d at 1192. "[T]he expression 'prim[a] facie case' in Title VII litigation popularly refers to a common, but not exclusive, method of establishing a triable issue of [employment] discrimination." *Volling* v.

25

*Kurtz Paramedic Servs.*, 840 F.3d 378, 383 (7th Cir. 2016) (first alteration in original) (quoting *Loyd* v. *Phillips Bros. Inc.*, 25 F.3d 518, 522 (7th Cir. 1994)). To set forth a prima facie case of discrimination, a plaintiff must establish the elements of a Title VII discrimination claim. *See Khalik*, 671 F.3d at 1192; *see also EEOC* v. *PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) (explaining a prima facie case of discrimination must consist of evidence of the elements of the claim). "Only after the plaintiff clears this initial hurdle does the burden shift to the employer to prove a 'legitimate, non-discriminatory reason for the adverse employment action.'" *Barlow* v. *C.R. Eng., Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (quoting *Khalik*, 671 F.3d at 1192). "If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Khalik*, 671 F.3d at 1192.

Of course, at the 12(b)(6) stage, a plaintiff need not conclusively *prove* a violation of Title VII. And the *McDonnell Douglas* burden shifting framework "does not create a pleading requirement." *Barrett* v. *Salt Lake Cnty.*, 754 F.3d 864, 867 (10th Cir. 2014) (explaining *McDonnell Douglas* applies "predominantly at summary judgment . . . to cases relying on indirect proof of discrimination"). At the 12(b)(6) stage, the "plaintiff must 'nudge [his] claims across the line from conceivable to plausible' in order to

26

survive a motion to dismiss." *Khalik*, 671 F.3d at 1190 (alteration in original) (quoting *Twombly,* 550 U.S. at 570). We therefore consider only whether Mr. McNellis has "sufficiently stated . . . claims for relief" by plausibly alleging either direct evidence of discrimination or a prima facie discrimination claim. *See Khalik*, 671 F.3d at 1193; *see also Reznik*, 18 F.4th at 1260 (explaining a plaintiff must "state a prima facie case" of her Title VII claim to survive a Rule 12(b)(6) motion to dismiss).

Here, Mr. McNellis asserts the district court erred in dismissing his discrimination claims because (1) "the allegations in the Amended Complaint contain direct evidence of discrimination"; and (2) "there are numerous allegations in the First Amended Complaint that establish a prima facie case of discrimination." Opening Br. at 22, 25. We are not persuaded Mr. McNellis has alleged any facts that, if true, would constitute direct evidence of discrimination. But we conclude Mr. McNellis has alleged facts that, *from circumstantial evidence*, "give rise to a reasonable inference of discrimination" based on his religion. *See Bekkem* v. *Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019). We explain our reasoning as to each conclusion.

**1**

As for direct evidence, Mr. McNellis first points us to his allegations that DCSD told him he was being investigated—and then ultimately

27

terminated—for his religious comments in the email exchange with DCSD staff about *The Laramie Project. See* App. at 98 ¶ 80 ("Ms. Franklin . . . informed Mr. McNellis that Defendant was investigating him due to the 'religious comments.'"); App. at 101 ¶ 114 ("Defendant directly cited Mr. McNellis's emails regarding The Laramie Project as the reason for his termination."). We cannot conclude Mr. McNellis has identified direct evidence of discrimination. Based on the allegations, a factfinder still would need to infer DCSD investigated and terminated plaintiff for his religious *beliefs*, and not, for example, for making religious comments that might have violated DCSD's policies.

Next, Mr. McNellis says Mr. Ottmann's letter is direct evidence of discrimination. We disagree. Recall, Mr. Ottmann wrote,

> The contents of [*The Laramie Project* emails were] eventually the catalyst for his firing, which I thought went too far. I felt like perhaps a "Letter of Reprimand" would have been appropriate, along with a conversation and perhaps an apology. I later learned that a specific group of people "piled on" the complaints about [Mr. McNellis], which played into the decision to ultimately terminate him as a DCSD employee.
>
> I truly believe that [Mr. McNellis] was "railroaded" by this specific group of people based on his political and religious views. In my opinion, his firing was unjust and unfair, and unfortunately, even though I was the principal, I couldn't save him because it wasn't my decision to make.

App. at 145–146. Mr. Ottmann's letter is plainly not "evidence of 'an existing policy which itself constitutes discrimination.'" *Wiltel*, 81 F.3d

28

at 1514 (quoting *Ramsey*, 907 F.2d at 1008)). But according to Mr. McNellis, the letter contains an admission DCSD terminated him "for his . . . 'religious views.'" Opening Br. at 23 (quoting App. at 102 ¶ 116). To be sure, the letter suggests Mr. McNellis's coworkers were motivated by his "political and religious views" to complain about him while he was under investigation. App. at 146. And those complaints "played into [DCSD's] decision to ultimately terminate him." App. at 146. But Mr. Ottmann also opined that some form of disciplinary action would have been "appropriate" under the circumstances, proposing a letter of reprimand, a conversation about Mr. McNellis's behavior, and an apology. Still, Mr. Ottmann's statements, taken as true, "require the trier of fact to infer that discrimination was a motivating cause of an employment decision." *Wiltel*, 81 F.3d at 1514. We thus conclude Mr. McNellis has not stated plausible Title VII and CADA claims by alleging direct evidence of discrimination.

**2**

We next consider whether Mr. McNellis has plausibly alleged circumstantial evidence of discrimination. In doing so, we consider the first step of the *McDonnell Douglas* framework: whether a plaintiff has "state[d] a prima facie case" of discrimination under Title VII. *See Reznik*, 18 F.4th at 1260; *see also Khalik*, 671 F.3d at 1193. "While the 12(b)(6) standard does not require that Plaintiff *establish* a prima facie case in her complaint, the

elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Khalik*, 671 F.3d at 1192 (emphasis added). To evaluate whether a complaint survives a motion to dismiss, we consider whether a plaintiff has "set forth a plausible claim in light of the elements of [her] claim." *Frappied* v. *Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1050 (10th Cir. 2020); *see also Morman* v. *Campbell Cnty. Mem. Hosp.*, 632 F. App'x 927, 935 (10th Cir. 2015) ("[A]bsent direct evidence of discrimination, we examine the first step of the *McDonnell Douglas* framework: the elements [plaintiff] would need to establish to prove a prima-facie case of . . . discrimination.").[12] We therefore turn to the elements of Mr. McNellis's discrimination claims and consider *de novo* whether the complaint sufficiently states those elements.

We have articulated the elements of a prima facie Title VII discrimination claim differently from case to case. *See Bennett* v. *Windstream Commc'ns., Inc.*, 792 F.3d 1261, 1266 n.1 (10th Cir. 2015) (noting "[t]he Tenth Circuit has utilized a number of similar versions of the test" for a prima facie discrimination claim). This flexible approach recognizes "the precise requirements of a prima facie [discrimination] case

---

[12] We cite this unpublished opinion only for its persuasive value. *See* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").

can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Furnco Constr. Corp.* v. *Waters*, 438 U.S. 567, 577 (1978)); *see also Plotke* v. *White*, 405 F.3d 1092, 1099 (10th Cir. 2005) ("[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged."). "The critical prima facie inquiry in all cases is whether the plaintiff has [alleged] that [an] adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Barlow*, 703 F.3d at 505 (quoting *Plotke*, 405 F.3d at 1100). In general, then, a Title VII plaintiff bringing a claim of employment discrimination must plausibly allege these elements: (1) "she is a member of a protected class," (2) "she suffered an adverse employment action," and (3) "the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett*, 792 F.3d at 1266; *see also PVNF*, 487 F.3d at 800. We rely on this "general" recitation of the elements in evaluating whether dismissal was required.[13]

---

[13] The district court had a slightly different understanding of the elements of a discrimination claim as set forth in *Khalik*, 671 F.3d at 1192. In *Khalik*, we described Title VII discrimination claims as comprising the following four elements: "(1) [plaintiff] is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the

31

position at issue, and (4) she was treated less favorably than others not in the protected class." *Id.* This formulation of the elements of a discrimination claim is not incorrect. But recall, the elements of a prima facie case "may vary depending on the nature of a claim." *Barlow* v. *C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012); *see also, e.g., Frappied* v. *Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1050 (10th Cir. 2020) (describing elements as "(1) he [or she] belongs to a protected class; (2) he [or she] was qualified for his [or her] job; (3) despite his [or her] qualifications, he [or she] was discharged; and (4) the job was not eliminated after his [or her] discharge." (alterations in original) (quoting *Kendrick* v. *Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000))); *Barlow*, 703 F.3d at 505 (identifying elements as "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination" (quoting *Salguero* v. *City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004))).

On appeal, DCSD invokes *Khalik* for the elements of a discrimination claim under Title VII. But the parties' arguments blend elements from both *Khalik* and other Tenth Circuit discrimination cases. For example, consistent with the fourth element from *Khalik*, DCSD contends Mr. McNellis failed to allege he was treated less favorably than *non-Christian* DCSD employees. But the parties also advance arguments about whether Mr. McNellis sufficiently alleged DCSD treated *similarly situated* employees more favorably. Although *Khalik* references disparate treatment to "others not in the protected class," it does not explicitly frame this element in terms of those other employees being *similarly situated* or describe what it means for employees to be similarly situated. 671 F.3d at 1192, 1194. Indeed, whether employees are considered "similarly situated" is a separate inquiry that looks to whether the individuals "deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *EEOC* v. *PVNF, L.L.C.*, 487 F.3d 790, 800–01 (10th Cir. 2007) (quoting *McGowan* v. *City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)). And we have described the "similarly situated" question as only "[o]ne method by which" a plaintiff can show the adverse employment action took place "under circumstances that give rise to an inference of discrimination." *See, e.g., id.* (identifying the elements of a discrimination claim as "(1) the victim belongs to a protected class; (2) the

32

Applying these principles, we now consider whether Mr. McNellis has plausibly alleged a claim under Title VII and CADA based on circumstantial evidence of religious discrimination. We conclude Mr. McNellis has done what our law requires at the pleading stage.

According to the district court, Mr. McNellis "needed to plead that he was treated less favorably than non-Christians at Ponderosa or in the school district." App. at 202. The district court acknowledged Mr. McNellis alleged that, during his investigation, DCSD received a complaint that he was part of a so-called "good ole boys club," along with at least three other employees. App. at 202 (quoting App. at 100 ¶ 101). But "nowhere does he allege these individuals were non-Christians," the district court observed. App. at 202. Mr. McNellis did not plead this specific fact, the district court reasoned, so his complaint "f[e]ll well short of" alleging the fourth element of a discrimination claim as described in *Khalik*: that the plaintiff was "treated

---

victim suffered an adverse employment action; and (3) *the challenged action took place under circumstances giving rise to an inference of discrimination*" (emphasis added)).

Here, our decision to rely on the more general recitation of the elements set forth in *Bennett* and *PVSF* is consistent with the well-established proposition that "we do not mandate the pleading of any specific facts in particular" for Title VII claims. *Khalik*, 671 F.3d at 1188.

less favorably than others not in the protected class." App. at 202–03; *Khalik*, 671 F.3d at 1192.

On appeal, Mr. McNellis contends the district court erred because "there are numerous allegations in the First Amended Complaint that establish a prima facie case of discrimination." Opening Br. at 25. He alleged he was treated less favorably than other DCSD employees and claimed DCSD's termination decision was "premised on [his] religious beliefs." Opening Br. at 25. We agree.

As an initial matter, we reject the district court's apparent assumption that Mr. McNellis "needed to plead" the non-Christian status of other DCSD employees to state a plausible claim. App. at 202. It is well-established that "we do not mandate the pleading of any specific facts in particular" to survive a motion to dismiss a Title VII discrimination claim. *Khalik*, 671 F.3d at 1194; *see also Bekkem*, 915 F.3d at 1274 (same). Rather, the "critical prima facie inquiry in all [discrimination] cases" is whether the plaintiff has adequately alleged "the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Barlow*, 703 F.3d at 505 (quoting *Plotke*, 405 F.3d at 1100). We thus proceed to consider whether Mr. McNellis's allegations meet this standard.

34

Alleging "the employer treated similarly situated employees more favorably" is "[o]ne method by which" a plaintiff can plead circumstances that give rise to an inference of discrimination. *PVNF*, 487 F.3d at 800–01. "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *Id.* at 801 (quoting *McGowan* v. *City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)). According to DCSD, Mr. McNellis has not successfully alleged the other members of the so-called "good ole boys" club were similarly situated to him. That is true. Mr. McNellis alleged no facts that would allow us to conclude these other DCSD employees shared a supervisor, evaluation and performance standards, or comparable behavior.

But we find Mr. McNellis's other allegations sufficient to give rise to an inference of discrimination. We consider the following allegations in reaching our conclusion:

- Mr. McNellis is a Christian man.

- Mr. McNellis was "qualified to perform the position of Assistant Principal and Athletic Director" at Ponderosa High School. App. at 102 ¶ 120.

- Throughout his employment with DCSD, Mr. McNellis "consistently received excellent performance reviews" and had never been subject to disciplinary action. App. at 94 ¶¶ 45–46.

35

- In a staff email chain, Mr. McNellis voiced his disagreement with the performance of a school play about the murder of a gay college student.

- He offered to "collaborate" with the school theatre department "[a]s a [C]hristian," citing how "the love that Jesus can provide will help [the] play." App. at 140; *see also* App. at 96 ¶ 64.

- The next day, DCSD informed Mr. McNellis he needed to stay home from work due to his "religious comments." App. at 97 ¶ 70.

- Three days after the email exchange, DCSD told Mr. McNellis he was being investigated and placed on leave due to "the religious comments." App. at 98 ¶ 80–81.

- Less than one month later, DCSD terminated Mr. McNellis's employment, and "Defendant directly cited Mr. McNellis's emails regarding The Laramie Project as the reason for his termination." App. at 101 ¶¶ 113–14.

"'While we do not mandate the pleading of any specific facts in particular,' a plaintiff must include enough context and detail to link the allegedly adverse employment action to a discriminatory or retaliatory motive with something besides 'sheer speculation.'" *Bekkem*, 915 F.3d at 1274–75 (quoting *Khalik*, 671 F.3d at 1194). Here, Mr. McNellis's allegations that DCSD repeatedly invoked his "religious comments" before investigating and terminating him provide a plausible link between his termination and a discriminatory motive. Under these circumstances, and at this procedural stage, that is sufficient to "nudge [his] claims across the line from conceivable to plausible." *Khalik*, 671 F.3d at 1190 (alteration in original)

36

(quoting *Twombly*, 550 U.S. at 570). Accordingly, we reverse the district court's dismissal of Mr. McNellis's religious discrimination claims under Title VII and CADA and remand for further proceedings.

## C

We next address Mr. McNellis's challenge to the district court's dismissal of his retaliation claims brought under Title VII and CADA. On *de novo* review, we agree with the district court that Mr. McNellis failed to state plausible Title VII and CADA retaliation claims.

Title VII "makes it unlawful for an employer to retaliate against an employee 'because [s]he has opposed any practice made an unlawful employment practice by this subchapter.'" *Khalik*, 671 F.3d at 1192 (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)). To survive a motion to dismiss, a plaintiff asserting a Title VII retaliation claim must "plausibly allege '(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'" *Reznik*, 18 F.4th at 1260 (quoting *Khalik*, 671 F.3d at 1193).[14] Mr. McNellis's Title VII and

---

[14] Similar to a Title VII discrimination claim, "[a] plaintiff can . . . establish retaliation either by directly showing that retaliation played a motivating part in the employment decision, or indirectly by relying on the

CADA retaliation claims "rise or fall together." *Johnson*, 594 F.3d at 1219 n.11 (internal quotation marks omitted); *see also Luke* v. *Hosp. Shared Servs., Inc.*, 513 F. App'x 763, 767 (10th Cir. 2013) (explaining Title VII and CADA retaliation claims are "subject to the same legal standards").[15]

**1**

Before reaching the merits of Mr. McNellis's appellate arguments, we provide a brief procedural background. In his complaint, Mr. McNellis alleged he "complained" to Mr. Ottmann and "several co-workers" about being investigated over his Christian beliefs. App. at 100 ¶¶ 95–96. He further alleged DCSD "was aware Mr. McNellis had complained . . . regarding retaliation based on his religious beliefs." App. at 100 ¶ 97. But

---

. . . *McDonnell Douglas* framework." *Khalik*, 671 F.3d at 1192. Mr. McNellis does not contend he alleged facts that, if proven, would constitute direct evidence of retaliation, nor do we identify any allegations in his complaint that would constitute direct evidence of retaliation. *See* Opening Br. at 22 (referring only to Mr. McNellis's alleged direct evidence of *discrimination*); *see also Shorter* v. *ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999) ("Direct evidence is '[e]vidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.'" (alterations in original) (quoting Black's Law Dictionary 460 (6th ed. 1990))), *overruled on other grounds by Desert Palace, Inc.* v. *Costa*, 539 U.S. 90 (2003). We therefore analyze Mr. McNellis's claim only by reference to the elements of a retaliation claim under Title VII and CADA.

[15] Although not precedential, we find the reasoning of this unpublished opinion instructive. *See* 10th Cir. R. 32.1(A) (permitting citation to unpublished decisions for their persuasive value).

in asserting his Title VII and CADA retaliation claims, he maintained only that "Defendant retaliated against Mr. McNellis *based on his religion*." App. at 103 ¶ 124, 106 ¶ 144 (emphasis added). The complaint did not allege DCSD retaliated against Mr. McNellis for complaining about the investigation. Later, when opposing DCSD's motion to dismiss, Mr. McNellis framed his retaliation claims somewhat differently. He contended he was terminated because he complained about being investigated "due to his religious comments." App. at 158.

The district court granted DCSD's motion to dismiss the Title VII and CADA retaliation claims. The district court first explained Mr. McNellis's emails about *The Laramie Project* "cannot be considered opposition to discrimination for purposes of stating a retaliation claim," and Mr. McNellis "does not argue otherwise." App. at 203. Mr. McNellis's complaints to Mr. Ottmann and other coworkers, however, "might be considered protected opposition to discrimination." App. at 203. But even so, the district court reasoned, "there are no allegations showing a causal connection between those complaints and Plaintiff's firing." App. at 203.

**2**

Mr. McNellis maintains reversal is required because he sufficiently alleged a causal connection between his complaints about the investigation

and his termination.[16] According to Mr. McNellis, "it stands to reason that Defendant, by way of its principal [Mr. Ottmann], terminated McNellis because he complained about being investigated due to his religious beliefs." Opening Br. at 26. We are unpersuaded.

"Pleadings that do not allow for at least a reasonable inference of the legally relevant facts are insufficient." *Bekkem*, 915 F.3d at 1275 (quoting *Burnett* v. *Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1236 (10th Cir. 2013)). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *See Robbins* v. *Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

Mr. McNellis failed to allege facts that, if true, could establish a causal link between the asserted protected activity (complaining to his colleagues about the investigation) and the materially adverse action (his termination). The complaint includes no allegations connecting Mr. McNellis's workplace complaints and his firing. Just the opposite: the complaint alleged "Defendant retaliated against Mr. McNellis based on his religion," *not based on his complaints to his colleagues. See* App. at 103

---

[16] Mr. McNellis does not contend on appeal that his emails about *The Laramie Project* should be understood as protected opposition to discrimination.

¶ 124, 106 ¶ 144. He also alleged Defendant "[t]erminat[ed] Mr. McNellis based on comments he made in his individual capacity as a Christian and a father of a child at Defendant's school." App. at 106 ¶ 147.[17] *See Khalik*, 671 F.3d at 1194 (affirming dismissal of Title VII retaliation claim where "there is nothing other than sheer speculation to link the . . . termination to a . . . retaliatory motive"). We affirm the district court's dismissal of Mr. McNellis's Title VII and CADA retaliation claims.

## III

We **AFFIRM** the dismissal of Mr. McNellis's free speech retaliation claim brought under 42 U.S.C. § 1983. We also **AFFIRM** the dismissal of Mr. McNellis's retaliation claims brought under Title VII and CADA. We **REVERSE** the dismissal of Mr. McNellis's discrimination claims brought under Title VII and CADA and remand to the district court for further proceedings consistent with this opinion.

---

[17] Mr. McNellis appears to contend causation can be inferred "[g]iven the proximity [in time] of McNellis' complaints and his termination." Reply Br. at 14–15. "We have held, '[a] retaliatory motive may be inferred when an adverse action closely follows protected activity.'" *Piercy* v. *Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) (quoting *Anderson* v. *Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999)). But Mr. McNellis advances this argument for the first time in his reply brief. As we have explained, "we routinely have declined to consider arguments that are not raised . . . in an appellant's opening brief." *Bronson*, 500 F.3d at 1104.

23-1306, *McNellis v. Douglas Cnty. Sch. Dist.*
**HARTZ**, J., concurring

I fully join Judge Rossman's opinion.

I write separately, however, because it continues to baffle me why we treat employment-discrimination claims differently from all other causes of action on review of a dismissal for failure to state a claim or a summary judgment. The *McDonnell Douglas* framework is an anomaly. Think how much simpler and more straightforward the opinion in this case would be if we engaged in the typical analysis of a dismissal on the pleadings. There would be no need to determine whether the complaint's allegations provided direct evidence of discrimination or merely circumstantial evidence. There would be no need to determine precisely what is necessary to state a prima facie case and whether each element was adequately alleged. Instead, we could do what we do in all other cases and just review whether the complaint adequately alleges that the plaintiff was injured by the employer's intentional discrimination against him. That may not always be an easy thing to determine, but at least we would not need to jump through the intricate hoops of *McDonnell Douglas*.

At the outset *McDonnell Douglas* was no doubt motivated to assist plaintiffs facing a judicial reluctance (there were no jury trials under Title VII at that time) to find discrimination by employers. Ironically now, or so I have heard, *McDonnell Douglas* is a favorite of the defense bar. It apparently is a wonderful tool to obtain dismissals or summary judgments. Why not adopt the traditional, neutral approach? The present

complicated framework simply distracts the courts from what should be the focus of the inquiry—the sufficiency of the allegations, or the evidence, of discrimination vel non.

Perhaps one day this court will have the opportunity to en banc this issue and determine to what extent our use of *McDonnell Douglas* is compelled by Supreme Court precedent. *See generally* Timothy M. Tymkovich, *The Problem with Pretext*, 85 Denver U. L. Rev. 503 (2008) (critiquing the *McDonnell Douglas* framework).